Lawrence D. KEEN, Appellant,

v.

Elizabeth KEEN, Appellee.

No. 49A04–9207–CV–245.

Court of Appeals of Indiana,
Fourth District.

March 2, 1994.

---

Richard A. Clem, Alden & Clem, Indianapolis, for appellant.

Evelyn Pitschke, Indianapolis, for appellee.

MILLER, Judge.

The relationship between Lawrence Keen, age 28, and Elizabeth Keen, age 27, was turbulent throughout the pendency of this divorce proceeding, and, for that reason, the trial court appointed a Guardian Ad Litem to represent the interests of their three-month old child, Alexis. Thereafter, the parents submitted an agreement to the trial court that gave Elizabeth custody of Alexis and Lawrence reasonable visitation. They also included a "child care" agreement that provided:

> [E]ach party to give first option to the other for child care during periods when either party might otherwise have the child but could not be with the child on that particular day or during that period.

When the Guardian later submitted his written recommendations limiting the terms of the child care provision, the trial court, without notice or hearing, accepted the Guardian's limitations and incorporated them into its final order.

Lawrence now argues that without a hearing with ten (10) days notice, as required by Ind.Code 31–1–11.5–22, the trial court improperly considered the Guardian's report. We agree and, therefore, reverse and remand for a hearing in compliance with I.C. 31–1–11.5–22.

Alternatively, Lawrence argues that the Keens' child care agreement (which the parties also refer to as a "baby-sitting" provision) is binding and, therefore, should have been adopted by the trial court. We disagree. While a parent's agreement is entitled to great weight, the Keen's facially ambiguous, perhaps intrusive, and, under these facts, unworkable agreement, must be subordinated to their child's best interests and, therefore, was not binding upon the trial court.

## DECISION

### I. THE REPORT OF THE GUARDIAN AD LITEM

■ Because the Keens were neither apprised of the Guardian's report, nor afforded the opportunity for a hearing before the trial court adopted the Guardian's recommendations limiting the child care provision, Lawrence first contends that the court's reliance on the Guardian's report was improper. His contention is correct.

I.C. 31–1–11.5–22 allows the court to order a Guardian Ad Litem to investigate and report on child custody arrangements. It further provides that the report may be received in evidence *if* the court has mailed the report to each party at least ten (10) days before the hearing. At the hearing, of course, the parents have the right to cross-examine the Guardian with respect to the recommendations.

The trial court's consideration of the report was error and, therefore, we reverse and remand for a hearing in compliance with I.C. 31–1–11.5–22.

### II. WAS THE KEENS' AGREEMENT BINDING ON THE TRIAL COURT?[1]

■ Lawrence further argues that the trial court is bound by the Keens' child care agreement and, for that reason, we should adopt their agreement. In support of his contention, Lawrence relies on *Wittwer v. Wittwer* (1989), Ind.App., 545 N.E.2d 27, 29,

for the proposition that once a stipulation is executed by the parties, the facts so stipulated are conclusive upon both the parties and the tribunal. In *Wittwer*, the divorced parents stipulated to the amount the father owed in child support arrearage. Lawrence's reliance is misplaced.

■ While both *Wittwer* and the present case deal with domestic issues, the stipulation in *Wittwer* was a stipulation of *fact*, which binds both the parties and the trial court. Here, the child care provision was not a stipulation of fact. Rather, one might say it was notice of an *agreement* between the parents, subject to court approval, regarding an aspect of their divorce and submitted pursuant to Ind.Code 31–1–11.5–10, which in pertinent part provides:

(a) To promote the amicable settlements of disputes that have arisen or may arise between the parties to a marriage attendant upon the dissolution of their marriage, *the parties may agree* in writing to provisions for the maintenance of either of them, the disposition of any property owned by either or both of them and *the custody* and support of their children.

(b) In an action for dissolution of the marriage the terms of the agreement *if approved by the court* shall be incorporated and merged into the decree . . .

(Emphasis added).

■ A later provision, Ind.Code 31–1–11.5–21(a)(2), instructs the court to determine custody in accordance with the best interests of the child and permits the court, among other things, to consider "the wishes of the child's parent or parents." This court has held that although the wishes of the parents are entitled to great weight, it is the duty of the trial court to determine what is in the best interests of the child. *Stevenson v. Stevenson* (1977), 173 Ind.App. 495, 503, 364 N.E.2d 161, 166. Thus, no agreement between parties that affects the custody of a child is automatically binding upon the trial court. *Id.*

---

1. Under Lawrence's theory, the trial court is bound by the parent's agreement regardless of its content and any report filed by the Guardian or any hearing held with regard to it would be rendered useless. Thus, the parties' agreement would effectively repeal I.C. 31–1–11.5–22.

Visitation is an element of a custody order. *Fox v. Fox* (1984), Ind.App., 466 N.E.2d 789, 791, *reh'g denied.* Ind.Code 31–1–11.5–24 ensures that the non-custodial parent will have "reasonable" visitation rights. While this statute does not specifically mention "child care" or "baby-sitting," those terms clearly relate to visitation and custody.

■ When either custody or visitation rights of the parents are determined, the best interests of the child are the primary consideration. *Matter of Paternity of Joe* (1985), Ind.App., 486 N.E.2d 1052, 1055. To that end, both custody and visitation conflicts are left to the trial court to resolve. *Id.* For example, in *Beeson v. Beeson* (1989), Ind. App., 538 N.E.2d 293, the trial court altered the parents' visitation agreement (which was characterized as a "stipulation"). On review, this court—without discussing either the specific terms of the parents' visitation agreement, the reason the trial court altered the provision in its final decree, or in what manner the decree was changed—found that such a stipulation cannot place restrictions upon a court's duty to protect the best interests of the child. *Id.* at 298.

■ However, in determining what is in the best interests of a child, the trial court must keep in mind that the right of parents to establish a home and raise their children is time-honored and protected by the Fourteenth Amendment. *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070; *Parent–Child Relationship of L.B. & S.C.* (1993), Ind.App., 616 N.E.2d 406, 407; *Shaw v. Shelby Cty. D. of Public Welfare* (1992), Ind.App., 584 N.E.2d 595, 601. Indeed, the state has no official guidelines for the every-day responsibilities of child-rearing, nor does the state have a special interest in substituting its judgment, through the authority of a judge, for that of a child's parents in carrying out those responsibilities.[2] For that reason, when reasonable parents are capable of carrying out their

agreement without court intervention, the judge should defer to the parents' agreement and refrain from imposing his or her personal conception of a preferential arrangement. One obvious exception is when an agreement might endanger the child's physical health or significantly impair his emotional development.[3] We find another exception occurs when the agreement, as here, is not in the best interests of the child because, among other things, it is ambiguous, unworkable, and almost certainly will demand further litigation.

■ Therefore, although rightfully entitled to great weight, the Keens' baby-sitting agreement does not bind the trial court if, in its discretion, the court has a *clear* basis for finding the agreement to be contrary to the best interests of the child.

Again, the Keen's child care provision states:

There shall be written into the decree a provision requiring each party to give first option to the other for *child care* during periods when either party might otherwise have the child but could not for one reason or another be with the child on that particular day or during that period.

R. 148. (emphasis added).

The term "child care" is defined as "of, relating to, or providing care for children, especially preschoolers." *American Heritage Dictionary* 332 (3d ed. 1992). For purposes of day care regulation and licensing,[4] Ind.Code 12–7–2–28.2 defines "child care" as "a service that provides for the care, health, safety, and supervision of a child's social, emotional, and educational growth." We find this term connotes a situation where one or more children of preschool age are cared for by an unrelated adult at a facility where there is an emphasis on preschool activities, usually for regularly scheduled periods of time.

2. Religious child-rearing guidelines were rejected by this court in *Elbert v. Elbert* (1991), Ind. App., 579 N.E.2d 102, 115, where Judge Baker pointed out in his concurring opinion that "[t]here are no state guidelines for religious upbringing, and that such guidelines would be inappropriate and unconstitutional."

3. *See* Ind.Code 31–1–11.5–21(b) (Child Custody Order) and Ind.Code 31–1–11.5–24 (Visitation).

4. Ind.Code 12–17.2 *et seq.* (day care regulation); Ind.Code 12–17.4 *et seq.* (day care licensing).

By contrast, a "baby-sitter" is defined as "a person engaged usually for pay and for relatively short periods of time to take care of a child or children while the parents are away from home." *Webster's Third New International Dictionary* 157 (1976). In *Tropical Coach Lines, Inc. v. King* (1962), Fla., 147 So.2d 318, 319, the supreme court defined a "baby-sitter" as "relating to one who takes care of a child during the temporary absence of its parents." Thus, we find this term connotes an irregular or sporadic situation characterized by a lack of a structured activity, generally taking place within the custodial parent's home.

Thus, the word "child care" as used in the Keens' agreement, is vague and renders the entire provision facially ambiguous because the terms of the agreement do not precisely reveal whether the parties intend an arrangement that contemplates a rather formalized "child care" situation, a more casual "baby-sitting" situation, both of these or neither. The agreement is, therefore, inherently unworkable because it is impossible to discern from its terms exactly what circumstances trigger the provision.

For example, do trips to the grocery, doctor appointments, or social engagements bring the provision into play? How long must the periods of absence be to require one parent to notify the other? Is this provision to be used in place of the child's normal day-care schedule while the custodial parent is at work?

Aside from the absence of specific triggers, this provision is devoid of the particular terms needed for effective implementation. The result is the generation of unanswerable questions that compound the unworkability of the agreement, and create logistical problems that will inevitably burden the court. For example, is the parent who plans to be away required to drop the child off at the home of the other? Will the child be cared for in the home of the parent who is away? If the parent who plans to be away is unable to get in touch with the other, is that parent required to wait until the other can be contacted before finalizing plans? How much notice is reasonably necessary?

Because the child care agreement here lacks specificity, it lacks the *finality* that should accompany a divorce decree. Rather than have the liberty to make the routine decisions regularly made by a custodial parent, Elizabeth will exist in the intrusive atmosphere created by fear of agreement violations, and the resultant contempt proceedings—accompanied, as always, by substantial attorney fees. She is tied to Lawrence in a way that destroys the privacy and spontaneity that rightfully accompanies her determinations about the child's upbringing. Her ability to provide a stable environment for her child is severely impeded. Ind.Code 31–1–11.5–21(b) guarantees the custodial parent the right to determine the course of the child's upbringing. In *Matter of Paternity of Joe, supra,* at 1057,[5] this court reversed the trial court's visitation order because we found it so disruptive as to be in derogation of the policy that a stable, consistent home environment is in the best interests of the child and is implicit in the right to determine a child's upbringing. *See also Adams v. Purtlebaugh* (1951), 230 Ind. 269, 102 N.E.2d 499. Here, the upheaval created by the Keens' agreement clearly contravenes public policy favoring stable environments for children and, therefore, is not in Alexis' best interests.

Further, the ambiguity of the terms of the child care provision, in addition to the parent's demonstrated lack of ability to get along, makes it a clearly unworkable arrangement and, therefore, not in the best interests of their child. The fact that the trial court found it necessary to *sua sponte* appoint a Guardian Ad Litem on behalf of the child illustrates the severity of the Keens' inability to function in a manner conducive to creating a stable environment for their child.

---

**5.** In *Paternity of Joe,* the mother, who was moving to Washington D.C. to commence a fellowship in medicine, argued that the trial court's visitation order (which was devised by the court, rather then by parental agreement) was in excess of the court's discretion. Essentially, the visitation order provided that the father was to have the twenty-two (22) month old child two weeks out of every month. Father was to pick the child up and return her to her mother's custody, as well as pay all transportation costs.

The foregoing discussion should not be construed to mean that every custodial agreement should be closely scrutinized in light of the trial court's personal notion of the model situation. On the contrary, custody agreements should be encouraged, and should receive deference from the trial court. While we recognize that parents can, and many do, agree to formally accept standard visitation guidelines while working out specific details privately, perhaps an ideal arrangement would be one in which mature parents agree that custody should be awarded to one parent with visitation as agreed upon between them. Such an agreement can insulate the sanctity of the parental role from state interference and recognizes that effective visitation contemplates the always changing activities, needs, and desires of the child.[6] However, even where the agreement is less than ideal, the trial court should not interfere unless the agreement is clearly against the best interests of the child.

Because the Keens' child care agreement was not in the best interests of their child, the trial court was not bound by it. However, because the trial court improperly considered the recommendations of the Guardian Ad Litem, we reverse and remand for a hearing on custody and visitation in compliance with I.C. 31-1-11.5-22.

Reversed and remanded.

NAJAM, J., concurring.

CHEZEM, J., concurring in result with separate opinion.

CHEZEM, Judge, concurring in result opinion.

I fully concur with the majority's decision to reverse the decision of the trial court and remand for a hearing on the issues of custody and visitation. However, I write separately to emphasize that, when a trial court refuses to follow an agreement of the parties, there must be evidence in the record to support the trial court's decision.

When determining the custody and visitation rights of the parties, the best interests of the child are paramount. *Matter of Paternity of Joe* (1985), Ind.App., 486 N.E.2d 1052, 1055. I agree with the majority that a trial court is not bound by a stipulation made by the parties if it is not in the best interests of the child and that it is the duty of the trial court to determine what is in the best interests of the child. *Stevenson v. Stevenson* (1977), 173 Ind.App. 495, 503, 364 N.E.2d 161, 166. The majority states that a trial court must have a "clear basis" for finding an agreement to be contrary to the best interests of the child. I would go a step further and require the trial court to find that the preponderance of the evidence supports a refusal to accept the parties' agreement as contrary to the best interests of the child. Before a trial court may reject an agreement by the parties concerning custody and visitation, there must be competent evidence before the court to support its decision to deviate from the agreement. In the instant case, there was no competent evidence before the court that the agreement should not have been followed. The trial court based its decision to disregard the Keens' agreement on the Guardian Ad Litem's report, which was improperly before the court as evidence. I would remand to the trial court for a hearing giving the parties the opportunity to respond to the Guardian Ad Litem report. This further evidence may very well support the trial court's decision to disregard the agreement.

6. We acknowledge that even the Keens' agreement could be workable *if* it were a private agreement entered into by cooperative parents outside the structured framework of a court order. On the other hand, attempting to enforce an agreement like the Keens' would only serve to embroil the court in the private day-to-day concerns of the parties and, as a result, would prove unduly burdensome on the court's resources.