

**FILED**

**Jul 23 2013, 6:17 am**

**CLERK**
of the supreme court,
court of appeals and
tax court

**FOR PUBLICATION**

ATTORNEYS FOR APPELLANT:

**AMY O. CARSON**
**ASHLEY BALICKI**
Mitchell & Associates
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**JORDYN KATZMAN MCAFEE**
Katzman & Katzman, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| KEVIN C. STONE, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | )　　No. 49A02-1210-DR-820 |
| | ) |
| JENNIFER M. STONE, | ) |
| | ) |
| Appellee. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robyn L. Moberly, Judge
The Honorable Kimberly D. Mattingly, Magistrate
Cause No. 49D05-1110-DR-40396

July 23, 2013

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Kevin Stone ("Father") appeals the trial court's award of primary physical and sole legal custody of his daughter, M.S., to his ex-wife, Jennifer Stone ("Mother"), as well as the award of attorney fees to Mother. We affirm in part, reverse in part, and remand.

## Issues

The issues we address are:

I.    whether the trial court erred in refusing to adopt the parties' mediated settlement agreement regarding custody of M.S. and allowing Mother to argue against the propriety of that agreement;

II.    whether the trial court erred in denying Father's motion to continue the final hearing regarding custody of M.S.; and

III.    whether the trial court's attorney fees order is contrary to the parties' settlement agreement.

## Facts

Mother and Father were married in 1998 and had one child during the marriage, M.S., who was born in 2000. On October 18, 2011, Mother filed a dissolution petition. The trial court never held a preliminary hearing on the matter, based on the parties' representation that they were going to participate in mediation to resolve matters of property distribution and child support and custody. The parties did participate in mediation on December 22, 2011. As a result of that mediation the parties executed a marital settlement agreement. Among other provisions, Mother was granted possession

of the marital residence. As for M.S., the parties agreed to joint legal and physical custody of her, with automatic review of the custody situation to occur in one year, and with Father paying child support to Mother. The agreement also specified how custody was to be split between the parties on an ongoing basis and how fall, winter, and spring school breaks would be divided. App. p. 183. On January 4, 2012, the trial court agreed to adopt the settlement agreement as a preliminary order on matters of child custody and support, until the parties completed a mandatory Children Cope with Divorce ("CCWD") class and until entry of a final dissolution decree.

Meanwhile, on Christmas Day, 2011, Father entered the marital residence uninvited after he had picked M.S. up to spend time with her. He pushed Mother into the house, shut the door and stood in front of it, and yelled at her and called her names. Mother told Father that he needed to leave because he had agreed that the marital residence would be hers, but he refused to do so. Mother tried to call 911 three times, although she was unable to do so the first two times because Father took her phone away and threw it into another room. M.S. witnessed the disturbance, and Mother was afraid that Father was going "to take me out now. This is it." Tr. p. 34. Eventually, Father left as police arrived; he was not arrested.

On December 27, 2011, Mother filed for an order of protection against Father. A temporary ex parte protective order was entered that day and the matter set for hearing. On January 25, 2012, the parties executed an agreed entry for Mother to dismiss the protective order in exchange for Father's promise not to threaten, stalk, or commit acts of

3

violence against Mother, or to communicate with Mother except with respect to discussing M.S.'s care, and to stay away from the marital residence and Mother's place of employment.

Aside from the Christmas Day incident, there was other evidence that Father was not coping well with the divorce. On more than one occasion, Father entered the marital residence alone and tore up marital photos and placed the pieces on Mother's pillow, or cut himself out of a family photo and put the photo back in the frame. The week of Thanksgiving 2011, Father sent a lengthy email to Mother's mother and sister, revealing his anger over the divorce and complaining that "you and your family have contributed to the end of my marriage. . . . I will never forgive you!" Ex. 5. In March 2012, Father sent an email to M.S.'s teacher and all the parents of M.S.'s classmates about Mother, saying "I would like to expose someone for the fraud, liar and thief that she is." Ex. 7. Father also wrote a letter to five of Mother's neighbors, again calling her a "fraud, liar and thief" and angrily denouncing her. Ex. 6. Father also has communicated with Mother by text, email, or letter by addressing her as "Thief" or "The Parent of [M.S.]." Tr. p. 46. Father also was uncooperative in communicating with Mother about M.S., including blocking Mother's calls from his and M.S.'s cell phones, insisting on communicating with Mother through M.S. and not directly, demanding that any emails to him contain a certain subject line or he would delete them without reading them, and making unilateral changes in parenting time.

4

On February 8, 2012, Mother requested that the trial court approve the mediated settlement agreement as the parties' final dissolution decree. On February 13, 2012, the trial court refused to approve the agreement, stating that it would not do so "without explanation as to how the proposed . . . plan is in the child's best interest." App. p. 4. However, the trial court did not schedule a hearing to address this issue. On March 28, 2012, Mother filed a motion stating, in part, that "[e]vents that have occurred since the parties entered into the Mediated Settlement Agreement, caused by the fault of [Father], have put [Mother] in a position that she cannot state that the proposed parenting time is in [M.S.]'s best interest." Id. at 214. The motion sought an order compelling Father to complete the CCWD class and to set a hearing "to establish [Father]'s parenting time only," while requesting that the property division parts of the settlement agreement be given effect. Id. On April 11, 2012, Father filed a "Request to Set a Hearing to Address [Father]'s Request to Set Aside the Mediated Agreement of Settlement." Id. at 217. In essence, this motion sought to set aside the entirety of the settlement agreement and also noted that Father had completed the CCWD class.

Pursuant to Mother's motion, the trial court set a two-hour hearing for May 21, 2012. On May 15, 2012, Father filed a motion to continue the hearing, requesting more time to prepare to address the issue of "determining if the previously agreed upon joint physical custody arrangement is in the best interest of the minor child." Id. at 220. The trial court denied the request. Mother was represented by counsel at this hearing, and

Father was not. Only Mother was able to testify at this hearing before the trial court ran out of time, and it continued the hearing to July 11, 2012.

At the conclusion of this hearing, after receiving the evidence described above regarding Father's behavior, the trial court stated in part: "everything I've heard today leads me to believe you do need a mental health evaluation. You will not go wrong voluntarily getting one." Tr. p. 106. The trial court also strongly advised Father to retain an attorney, "for [M.S.]'s sake . . . ." Id. at 103. On June 6, 2012, the trial court referred Father to receive a mental health evaluation through the Marion County Family Court Project ("MCFCP"). However, Father was not notified of the referral at this time.

Father hired an attorney on June 4, 2012. On June 15, 2012, the attorney notified Father that she would be withdrawing her appearance, due to a conflict of interest. On June 20, 2012, Father moved for a continuance of the July 11 hearing in order to obtain new counsel. On June 21, 2012, Mother filed a petition for sole legal custody of M.S., requesting that the issue be heard at the July 11 hearing. On June 25, 2012, the trial court held a pretrial conference, at which time Father learned for the first time about the mental health evaluation referral. The trial court also granted Father's counsel permission to withdraw on that date and also denied Father's continuance request.

On June 26, 2012, Father filed a second continuance request, reiterating that he needed time to hire a new attorney, and also claiming that he had to be out-of-town on business on July 11, 2012. The trial court denied this request. On that same day, Father filed his own request for sole legal custody. On June 28, 2012, Father contacted the

6

MCFCP office to schedule his mental health evaluation; it eventually was scheduled for July 16, 2012. Father retained a new attorney on July 2, 2012. This attorney filed another continuance motion, stating that she needed additional time to prepare for the hearing and further noting that it would not be possible for Father to complete the mental health evaluation before the hearing date, "and the results of that evaluation will likely assist the Court with making custody and parenting time orders." App. p. 237. This motion requested the hearing be continued until August 2012; the trial court denied it.

The hearing went ahead as scheduled on July 11, 2012. Mother testified that Father's communication regarding M.S. had not improved since the last hearing. At the conclusion of the hearing, the trial court gave the parties until August 10, 2012, to submit proposed orders. The trial court and the parties also discussed the fact that Father was scheduled to undergo his mental health evaluation in five days. The trial court said, "If you want me to [consider the evaluation report], I'll be glad to. If you want to wait to see what it says, that's fine." Tr. p. 434. After discussion of whether the evaluation report would be confidential, the trial court concluded, "I'll show it under advisement pending submission of that additional information and the proposed orders." Id. at 439.

On August 15, 2012, the trial court entered its final decree of dissolution. It approved and incorporated as part of the decree all the provisions in the settlement agreement dealing with property distribution. The trial court specifically found, "no evidence has been presented that shows unfairness, unreasonableness, manifests [sic]

7

inequity, or shows that execution of the Mediated Agreement was procured through fraud, misrepresentation, coercion, duress, or lack of full disclosure." App. p. 13.

Included in the agreement approved and incorporated by the trial court was a provision requiring Father to pay one-half of Mother's attorney fees incurred through December 22, 2011, and further stating, "Each party shall be responsible for the payment of his or her own attorney's fees incurred after December 22, 2011." Id. at 24. The trial court did not approve of the settlement agreement's child custody provisions. Instead, it awarded Mother primary physical and sole legal custody of M.S. As for Father's visitation, the trial court required it to be supervised and allowed much less than what is recommended by the Indiana Parenting Time Guidelines. The trial court specifically found in part that Father had been exhibiting "irrational behavior" since the beginning of the divorce proceedings and that "Father's mental instability is clearly significant as it could continue to harm [M.S.]'s emotional development." Id. at 14. The trial court ordered that Father complete his mental health evaluation and "follow the therapist's recommendations with regard to treatment." Id. The dissolution decree further required Father to pay $5,000 toward Mother's attorney fees, due to his behavior and disparate earning ability.

On August 17, 2012, the MCFCP office filed with the trial court its report of Father's mental health evaluation. The psychologist who examined him reported in part:

> In light of the psychological test data, clinical observation and social history, it would appear that Mr. Stone is relatively stable and appropriate in his overall psychological

8

maladjustment[1] and does not present with any significant psychological difficulties. Statements cannot be made about the nature of the relationship he has with his daughter, . . . although it is assumed on the basis of this evaluation that the probability of it being satisfactory is good.

Id. at 272. The psychologist did not recommend that Father undergo any treatment.

On September 13, 2012, Father filed a motion to correct error and for a new trial, followed by another such motion on September 14, 2012. The motion alleged in part that the trial court erred in awarding primary physical and sole legal custody of M.S. to Mother without considering his mental health evaluation. On September 24, 2012, the trial court denied the motions without explanation. Father initiated this appeal. Afterwards, on March 28, 2013, the trial court approved a mediated agreement filed by the parties that granted unsupervised visitation to Father in accordance with the Indiana Parenting Time Guidelines.[2] The agreement also indicated that the parties had agreed that future matters in the case be resolved by a different trial judge than had issued the original dissolution decree.

## Analysis

The trial court here entered findings sua sponte. In such a situation, the specific factual findings control only the issues that they cover, while a general judgment standard

---

[1] Although the report uses the word "maladjustment" here, there is no finding anywhere in the report that Father suffers from any kind of mental illness.

[2] Father argues on appeal that the trial court erred in ordering supervised visitation between him and M.S. Mother argued in her brief that the March 28, 2013 agreement, a file-stamped copy of which she included in her appendix, rendered this argument moot. Father did not file a reply brief arguing otherwise, and we will not address his argument regarding supervised visitation.

applies to issues upon which there are no findings. C.B. v. B.W., 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), trans. denied. It is not necessary that each and every finding be correct, and even if one or more findings are clearly erroneous, we may affirm the judgment if it is supported by other findings or is otherwise supported by the record. Id. We may affirm a general judgment with sua sponte findings upon any legal theory supported by the evidence introduced at trial. Id. Although sua sponte findings control as to the issues upon which the court has found, they do not otherwise affect our general judgment standard of review, and we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court. Id.

As for review of the accuracy of findings that have been entered, we first consider whether the evidence supports them. Id. Second, we consider whether the findings support the judgment. Id. We will disregard a finding only if it is clearly erroneous, which means the record contains no facts to support it either directly or by inference. Id. A judgment also is clearly erroneous if it relies on an incorrect legal standard, and we do not defer to a trial court's legal conclusions. Id. However, we must give due regard to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence, and must consider only the evidence most favorable to the judgment along with all reasonable inferences drawn in favor of the judgment. Id.

We also note that we "give considerable deference to the findings of the trial court in family law matters . . . ." MacLafferty v. MacLafferty, 829 N.E.2d 938, 940 (Ind.

10

2005). Whether reviewing a case for "clear error" or "abuse of discretion," this appellate deference is, first and foremost, a reflection that the trial court is in the best position to judge the facts, ascertain family dynamics, and judge witness credibility and the like. Id. at 940-41. "Secondly, appeals that change the results below are especially disruptive in the family law setting." Id. at 940. "But to the extent a ruling is based on an error of law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result." Id. at 941.

## I. Settlement Agreement as to Custody

Father first argues that the trial court erred in refusing to enforce the parties' mediated settlement agreement providing for joint physical and legal custody of M.S., and in permitting Mother to effectively repudiate the agreement on that point by requesting primary physical and sole legal custody of M.S. "To promote the amicable settlements of disputes," parties in a dissolution action may enter written agreements that include provisions for child support and custody. Ind. Code § 31-15-2-17(a). By statute, trial courts are not required to accept such agreements, and they may enter their own orders regarding dissolution matters, including child support and custody. I.C. § 31-15-2-17(b). Additionally, parties to a written settlement agreement may jointly request that a trial court enter a summary dissolution decree based upon the settlement without holding a final hearing. I.C. § 31-15-2-13. However, the statute provides that a trial court "may" enter such a decree; it is not required to do so upon the parties' request. Id.

11

There are a number of cases addressing the extent to which trial courts must accept, and parties may be allowed to repudiate, settlement agreements regarding child custody. In Keen v. Keen, 629 N.E.2d 938 (Ind. Ct. App. 1994), we addressed a situation in which a trial court refused to approve and modified the parties' settlement agreement regarding child custody and parenting time, based on the opinion of a guardian ad litem ("GAL"). We reversed, based on a technicality related to the GAL, and remanded for the trial court to conduct a custody hearing. In doing so, we rejected the father's argument that the trial court was bound to accept the parties' child custody agreement as is, holding that "no agreement between parties that affects the custody of a child is automatically binding upon the trial court." Keen, 629 N.E.2d at 940. We observed that the wishes of the parents are only one factor out of several for a trial court to consider when making a custody determination. Id. (citing I.C. § 31-1-11.5-21(a)(2) (1994), now codified as I.C. § 31-17-2-8). We also noted that "the best interests of the child are the primary consideration" when child custody or visitation rights are concerned and, therefore, "both custody and visitation conflicts are left to the trial court to resolve." Id. Acknowledging that a child custody agreement generally should be given "great weight," in light of parental constitutional rights to raise their children, we noted several instances in which a trial court should not defer to such an agreement as being in the best interests of a child. Id. Such circumstances include when there is evidence that an agreement might endanger a child's physical health or significantly impair his or her emotional development, or

12

when the agreement is ambiguous, unworkable, and likely to demand further litigation. Id.

In Voigt v. Voigt, 670 N.E.2d 1271 (Ind. 1996), our supreme court addressed the circumstances in which a trial court should be permitted to reject or modify a dissolution settlement agreement; the particular settlement agreement provision at issue in the case involved spousal maintenance. The court held as a general rule that "the power to disapprove a settlement agreement must be exercised with great restraint." Voigt, 670 N.E.2d at 1277. Furthermore, "[i]n reviewing a settlement agreement, a court should concern itself only with fraud, duress, and other imperfections of consent, . . . or with manifest inequities, particularly those deriving from great disparities in bargaining power." Id. at 1278. However, the court also pointedly stated, "Of course . . . the same principles and standards cannot apply to child custody and support provisions of proffered settlement agreements. . . . If there is one overriding policy concern in dissolution actions, it is protecting the welfare and interests of children." Id. at 1278 n.10.

In In re Paternity of K.J.L., 725 N.E.2d 155 (Ind. Ct. App. 2000),[3] a mother in a paternity action repudiated a previous stipulation as to child custody that she had agreed to under oath during a court hearing, prior to the court receiving any evidence regarding custody or the best interests of the child. The trial court refused to accept the mother's repudiation and adopted the stipulation as its final custody ruling. Citing Keen and

---

[3] As we noted in that case, "the underlying principle behind both the paternity and dissolution statutes is the same: the best interest of the child." K.J.L., 725 N.E.2d at 157.

13

Voigt, among other cases, we held that the trial court erred in not holding a hearing and in adopting the stipulation after the mother had repudiated it. K.J.L., 725 N.E.2d at 159. We stated that although "the courts of this state have always encouraged parties to enter into agreements settling their own affairs, agreements pertaining to the support and custody of children are of a different character and will not be deemed effective unless, and until, they are approved by the court." Id.

In Beaman v. Beaman, 844 N.E.2d 525 (Ind. Ct. App. 2006), a trial court accepted a proffered settlement agreement as to child custody, but there was no indication in the record that the trial court had ever considered whether the agreement was in the child's best interests, even though it had conducted two dissolution-related hearings. Relying on Voigt, Keen, and K.J.L., we stated, "Although courts should give great weight to the wishes of the parents, it is the duty of the trial court to determine if any agreement is in the best interests of the child." Beaman, 844 N.E.2d at 532. "A trial court cannot 'rubber-stamp' such an agreement." Id. at 533. We noted that on its face, the child custody agreement contained at least one "unorthodox" provision that seemingly had the potential to be unworkable and lead to future litigation. Id. We remanded for the trial court to conduct an "examination" of the custody agreement. Id.

Reno v. Haler, 734 N.E.2d 1095 (Ind. Ct. App. 2000), aff'd on r'hg, 743 N.E.2d 1139 (Ind. Ct. App. 2001), trans. denied, seems to represent a slightly different approach to child custody settlement agreements, one that requires more trial court deference to such agreements. In that case, the parties participated in mediation and reached various

agreements, including as to child custody, and both husband and wife signed handwritten notes of the meeting. However, the wife refused to sign the full agreement after it was printed out and presented for her signature. The wife subsequently told the trial court that she had repudiated the agreement, but the trial court rejected her repudiation and approved the mediated settlement in full as the final dissolution decree, including its child custody provision. This court affirmed. First, although the trial court made no express finding that the custody agreement was in the child's best interests, it did state that the agreement was "fair, reasonable and proper," which the court held sufficient to establish that the trial court had found the agreement to be in the child's best interests. Reno, 734 N.E.2d at 1100.

Second, the court concluded that the trial court properly refused to permit the wife to repudiate the mediated settlement. The court distinguished K.J.L. on the basis that K.J.L. concerned a non-mediated oral settlement agreement (although one given under oath during a court hearing), while the case it was deciding concerned a mediated written settlement (although the wife refused to sign the final printed agreement). Id. at 1100-01. Also, the Reno court held that a trial court should uphold a written agreement concerning child custody unless a party is able to establish the existence of "'some unfairness, unreasonableness, manifest inequity in the terms of the agreement, or that the execution of the agreement was procured through fraud, misrepresentation, coercion, duress, or lack of full disclosure.'" Id. at 1101 (quoting Gabriel v. Gabriel, 654 N.E.2d 894, 898 (Ind. Ct. App. 1995), trans. denied). Although Gabriel solely concerned a property settlement

15

agreement, the <u>Reno</u> court stated, "We believe the same is applicable to settlement agreements involving child custody and visitation." <u>Id.</u> <u>Reno</u>'s holding was followed in two other cases from this court. See <u>In re Paternity of K.R.H.</u>, 784 N.E.2d 985, 989 (Ind. Ct. App. 2003); <u>Carrasco v. Grubb</u>, 824 N.E.2d 705, 711 (Ind. Ct. App. 2005), <u>trans. denied</u>.

<u>Reno</u>, <u>K.R.H.</u>, and <u>Carrasco</u> did not discuss or cite <u>Voigt</u>. Thus, there was no acknowledgment in those cases of our supreme court's clear statement that while dissolution settlement agreements dealing with property and maintenance issues generally should be upheld unless there is <u>Gabriel</u>-type evidence of fraud, coercion, or manifest inequity, a different standard applies altogether to custody agreements. Namely, the "overriding policy concern" is the best interests of the child or children. <u>Voigt</u>, 670 N.E.2d at 1278 n.10.

It is unclear to us that a parent should be forbidden, before a mediated settlement agreement regarding child custody is approved and made effective by a trial court, from alerting a trial court to his or her concerns about the agreement and whether it is truly in the child's best interests. If a party is having second thoughts about the propriety of a child custody agreement, we do not see why a trial court should be prohibited from taking such reluctance into consideration when deciding how thoroughly to examine whether the agreement suits the child's best interests, which is the "overriding" concern in any dissolution where children are involved—a concern that trumps the interest in promoting the settlement of disputes. In the present case, regardless of whether Mother repudiated

16

the settlement agreement, the trial court clearly and properly indicated before repudiation that it was not going to approve the agreement without some explanation as to how the agreement was in M.S.'s best interests. And at the subsequent hearings to address M.S.'s best interests, we do not believe Mother should have been prevented from presenting all relevant evidence on that issue, even if that evidence indicated that the settlement agreement was not in M.S.'s best interests and even if, as the trial court found, there was no evidence of fraud or coercion in the procurement of the settlement agreement. We see nothing improper in the manner in which the trial court proceeded.[4]

We also note Father argues in part that Mother should not be permitted to repudiate the settlement agreement because he voluntarily gave up his interest in the marital residence "in exchange for exercising joint legal and physical custody of the parties' child." Appellant's Br. p. 27. He further states, "It is not unusual for parties to give up his or her portion of a marital estate in exchange for more parenting time with a child." Id. We submit that this is precisely one reason why courts must independently evaluate agreements on child custody, to ensure that a child was not used as a bargaining chip by one party, within the often acrimonious atmosphere of a divorce proceeding, to extract more marital property from the other party regardless of whether the resulting child custody arrangement would be in the child's best interests. Parents should neither be able to "buy" more parenting time, nor have it withheld for being reluctant to give up

_____

[4] We need not definitively resolve whether a trial court must always conduct a full evidentiary child custody hearing when the parties have reached a settlement agreement in order to determine whether the agreement is in the child's best interests. It suffices to say that the trial court did not err here in conducting such hearings.

17

marital property, without regard to a child's best interests. As our supreme court very recently stated, "Every child deserves better than to be treated as nothing more than a bargaining chip." Perkinson v. Perkinson, No. 36S05-1206-DR-371, slip op. p. 8 (Ind. June 25, 2013). We also believe that even if a trial court does not accept the child custody provisions of a settlement agreement, that is no reason for it to reject provisions with respect to property division, contrary to Father's suggestion. In sum, the trial court did not err in refusing to approve the settlement agreement with respect to child custody without evidence and argument as to whether it was in M.S.'s best interests.

## II. Denial of Continuance

Next, we address Father's contention that the trial court abused its discretion in denying his three continuance motions filed in advance of the July 11, 2012 hearing. We will reverse a trial court's denial of a continuance motion only for an abuse of discretion. F.M. v. N.B., 979 N.E.2d 1036, 1039 (Ind. Ct. App. 2012). Generally, an abuse of discretion occurs if a ruling is clearly against the logic and effect of the facts before the court or the reasonable and probable deductions that may be drawn from the facts. Id. Additionally, an abuse of discretion may occur in the denial of a continuance motion if the moving party showed good cause for granting the motion. Id. Furthermore, in order to establish an abuse of discretion in the denial of a continuance, it must be demonstrated that the moving party was prejudiced by the denial. Id. Other factors to consider include whether the record demonstrates dilatory tactics on the part of the movant designed to

18

delay coming to trial, and whether a delay would have prejudiced the opposing party to an extent sufficient to justify denial of the continuance. Id. at 1041.

Father argues the trial court abused its discretion in denying the continuance motions based both on his efforts to obtain counsel before the hearing and the short period of time his second attorney had to prepare, and on the mental health evaluation that would not take place until after the hearing. We find an abuse of discretion as it relates to the mental health evaluation, which was only raised in the third continuance motion, and we need not address the arguments related to counsel.

It is undisputed that Father did not learn of the mental health evaluation referral until June 25, 2012. Father thereafter acted expeditiously in scheduling that evaluation, but it was still not set to take place until after the July 11, 2012 hearing.[5] As reflected in the trial court's findings, its concern over Father's mental health clearly was one of the primary motivating factors behind its decision to reject the settlement agreement regarding custody and to severely restrict Father's parenting time. The findings regarding Father's mental health were not supported by any expert testimony, and the results of the mental health evaluation flatly contradict those findings. Mother has not demonstrated that a continuance would have prejudiced her. We accept that continuances

---

[5] Mother notes that the trial court told Father at the end of the May 21, 2012 hearing that he would "not go wrong voluntarily getting" a mental health evaluation and argues that he should not have waited for a court referral to schedule an evaluation. Tr. p. 106. Suggesting that Father voluntarily undergo a mental health evaluation is much different than referring him for a court-ordered evaluation, however. It is much more difficult to perceive why the trial court would deny a short continuance for Father to undergo a court-ordered evaluation, than if Father had delayed voluntarily undergoing such an examination.

19

in cases involving children should not be granted as a matter of routine, but a short delay in order to allow the collection and presentation of highly relevant evidence before issuing a final ruling regarding custody would have been appropriate. The trial court itself indicated at the July 11, 2012 hearing that it would delay final ruling in the case until it had received "additional information," i.e. apparently the results of the mental health evaluation, but in fact it did not wait for that information. Tr. p. 439

We also note that Father gambled regarding the results of the mental health evaluation. If the continuance had been granted but the results of the evaluation were unfavorable to him, he would have been harmed by the granting of the motion. In other words, it is not as if Father only claimed error with respect to the mental health evaluation after learning that its results favored him. We conclude that Father demonstrated good cause for continuing the July 11, 2012 hearing, that he was not dilatory, that Mother would not have been prejudiced by the granting of a continuance, and that Father clearly was prejudiced by its denial. Thus, the trial court abused its discretion in denying Father's third continuance motion.[6]

We note that Father does not challenge the trial court's general finding that the settlement agreement was not procured by fraud, coercion, or other imperfections of consent, and thus approving the property division portions of the agreement. Although

---

[6] Father also argues the trial court evidenced bias against him in various comments it made during the hearings. Because we are reversing and remanding for a new hearing, we need not address this issue. We also note that the parties' case has been transferred to a different trial judge, per their agreement, and assume this new judge will be hearing the case upon remand. We also decline to address Father's argument that the trial court's award of primary physical and sole legal custody to Mother was not supported by the evidence.

Father seems to argue that disapproval of the child custody portion of the agreement required disapproval of its property division provisions, we have rejected that argument. Father makes no other substantive argument that the trial court erred in accepting the parties' division of property, nor does he argue that the granting of a continuance was necessary to allow him to address that issue before the trial court. Thus, we reverse and remand for the trial court to conduct a new hearing and issue a new ruling only with respect to child custody, under the standard for original child custody orders and not modifications; the trial court should give great, but not binding weight to the parties' mediated settlement agreement, as described above. In the interests of M.S.'s stability, the current child custody order should remain in effect until the trial court issues a new ruling.

### III. Attorney Fees

The final issue we address is whether the trial court erred in ordering Father to pay $5,000 toward Mother's attorney fees. This award was based upon an attorney fee affidavit outlining Mother's legal expenses incurred between December 22, 2011, and July 4, 2012. Father argues this order is irreconcilable with the trial court's approval of that portion of their settlement agreement providing, "Each party shall be responsible for the payment of his or her own attorney's fees incurred after December 22, 2011." App. p. 24.

Mother contends Father is precluded from making this argument on appeal because he did not include it as a ground of alleged error in either of his motions to

correct error. We disagree. Indiana Trial Rule 59(A) only mandates motions to correct error as a prerequisite to appeal when a party claims newly discovered evidence or that a jury verdict is excessive or inadequate. Father's argument regarding attorney fees does not fall within either of these categories. When a party files a motion to correct error, he or she is not precluded from raising issues on appeal that were not included in the motion, unless it was an issue required to be included by Trial Rule 59(A). See Franciose v. Jones, 907 N.E.2d 139, 144 (Ind. Ct. App. 2009), aff'd on r'hg, 910 N.E.2d 862 (Ind. Ct. App. 2009), trans. denied. We will address Father's argument on the merits.

Mother contends the trial court had discretion to award attorney fees based upon Indiana Code Section 31-15-10-1, which generally permits a court to "order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this article and for attorney's fees and mediation services . . . ." Mother, however, does not respond substantively to Father's argument that the settlement agreement was binding upon the parties and trial court once it approved the agreement and incorporated it as part of the dissolution decree and that the agreement clearly requires each party to bear his or her own attorney fees incurred after December 22, 2011.

Dissolution settlement agreements may contain binding provisions regarding attorney fees, including allocation of fees in future disputes between the parties. Pond v. Pond, 700 N.E.2d 1130, 1136 (Ind. 1998). Unless a trial court finds evidence of fraud, duress, or other imperfections of consent, such as outlined in Voigt, the court must give

22

full force and effect to a settlement agreement's attorney fees provisions. Id. at 1137. Again, the trial court here specifically found no evidence of fraud, duress, or imperfections of consent, a finding neither party challenges. As such, the trial court was required to give full force and effect to the agreement's attorney fees provision. It thus erred in requiring Father to pay $5,000 toward attorney fees that Mother incurred after December 22, 2011.

## Conclusion

The trial court did not err in refusing to approve the parties' settlement agreement regarding child custody without receiving evidence regarding whether the agreement was in M.S.'s best interests, nor did it err in allowing Mother to present evidence and argue that it was not in M.S.'s best interests. We do conclude the trial court abused its discretion in denying Father's third continuance motion and, therefore, we reverse and remand for a new hearing regarding custody of M.S. We also reverse that part of the dissolution decree ordering Father to pay $5,000 towards Mother's attorney fees. The dissolution decree's property division orders, as reflected in the settlement agreement, are affirmed.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and BAILEY, J., concur.

23