## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2016, 7:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erik H. Carter
Carter Legal Services LLC
Noblesville, Indiana

ATTORNEY FOR APPELLEE

Brent R. Dechert
Kokomo, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Marriage of:

Reed Stoeckley,

*Appellant-Respondent,*

v.

Christina Stoeckley,

*Appellee-Petitioner.*

November 15, 2016

Court of Appeals Case No.
34A05-1604-DR-994

Appeal from the Howard Superior Court

The Honorable Rick Maughmer, Special Judge

Trial Court Cause No.
34D04-1404-DR-350

**Bradford, Judge.**

# Case Summary

Appellant-Respondent Reed Stoeckley ("Father") appeals the trial court's order granting Appellee-Petitioner Christina Stoeckley's ("Mother") motion to modify Father's parenting time with the parties' children. Father raises numerous issues which we consolidate and restate as whether the trial court's order modifying the parties' parenting time order is clearly erroneous. Concluding that the trial court's order is not clearly erroneous, as it is supported by sufficient evidence, we affirm.

# Facts and Procedural History

Mother and Father were married on July 29, 2006. They are the parents of I.S., who was born on March, 25, 2008, and L.S., who was born on February 9, 2011. Mother and Father separated on or about January 10, 2014.

On December 22, 2014, Mother and Father filed an agreement relating to custody, visitation, and division of property. The trial court accepted the terms of the parties' agreement and incorporated the parties' agreed terms into its dissolution order which it entered on February 17, 2015. With respect to custody and visitation, the dissolution order provided as follows:

> 1.     Petitioner/[Mother] [is] to have physical custody of the parties' children and parties shall share joint legal custody.
> 2.     The Indiana Parenting Time Guidelines shall apply with Respondent/[Father] to have alternate weekends and one mid-week overnight on Wednesday. [Father] shall consume no alcohol before or during visits. The parties' child, [L.S.], shall

continue to attend daycare three (3) days per week. [Father] shall be permitted to pick [L.S.] up at daycare at 2:00 p.m. and pick up [I.S.] at school if [Mother] is working. The children shall be returned at 5:00 p.m. to [Mother] by [Father] wherever [Mother] may be located. Both parties shall have reasonable telephonic communication with the children.

Appellant's App. pp. 16-17.

[4] The parties subsequently filed numerous motions, one of which was a motion to modify parenting time filed by Mother on November 20, 2015. On March 23, 2016, the trial court conducted a hearing during which it heard argument and evidence relating to the parties' outstanding motions. On March 30, 2016, the trial court granted Mother's request to modify parenting time. In its order, the trial court found as follows:

6. Father loves his children and has fully exploited the provisions contained in [the dissolution order], to wit:
   a. Father daily picks the children up from their respective school buildings.
   b. Father daily drives to the schools at the beginning of the day to wish his children a good day at school.
   c. Father works within the school system and frequently eats lunch at the school with one of the children.
   d. Father pursues daily telephone contact with his children in spite of having them in his physical presence during a portion of the day.
   e. Father's actions toward [M]other relative to the children may border on the inappropriate. ([S]itting in front of [M]other's residence, you tube posts, etc[.])

7. Father was characterized as many things during the hearing, but the court felt that the designation as a 'helicopter parent' was appropriate, given [F]ather's hovering over the children to excess.

8. Father's constant presence is causing angst with [M]other, which in turn affects the children.

9. Mother seeks to modify [F]ather's parenting time.

10. Father's actions post dissolution [are] negatively affecting the mental health of [M]other and [the] children.

11. A modification of parenting time is in the best interests of the parties' children.

12. Father shall have parenting time in accordance with the [Indiana Parenting Time Guidelines]. In addition thereto, [F]ather shall have Wednesday overnight visitation each week with the children. On Wednesday, [F]ather shall pick the children up from school and be responsible for the children getting to school on time the next Thursday morning. Mother shall be responsible for picking up after and delivering the children to school the remainder of the school days. Father shall not interfere, intervene, or participate in [M]other taking or recovering the children from their schools. Father shall not pursue telephone contact with the children on the days they have been in [F]ather's physical presence. Telephone contact, when it occurs, shall be limited to ten minutes per day per child.

Order.

# Discussion and Decision

[5] On appeal, Father contends that the trial court's order is clearly erroneous because the evidence is insufficient to support the modification of the parties' parenting time order. In this case, the trial court entered sua sponte findings.

In such a situation, the specific factual findings control only the issues that they cover, and a general judgment standard applies to issues upon which there are no findings. *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013), *aff'd on reh'g*. "It is not necessary that each and every finding be correct, and even if one or more findings are clearly erroneous, we may affirm the judgment if it is supported by other findings or is otherwise supported by the record." *Id*. We may affirm a general judgment with sua sponte findings on any legal theory supported by the evidence. *Id*. In reviewing the accuracy of findings, we first consider whether the evidence supports them. *Id*. We then consider whether the findings support the judgment. *Id*. "We will disregard a finding only if it is clearly erroneous, which means the record contains no facts to support it either directly or by inference." *Id*.

A judgment also is clearly erroneous if it relies on an incorrect legal standard, and we will not defer to a trial court's legal conclusions. *Id*. at 998-99. We give due regard to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence, and we must consider only the evidence most favorable to the judgment along with all reasonable inferences drawn in favor of the judgment. *Id*. at 999. Additionally, we "'give considerable deference to the findings of the trial court in family law matters....'" *Id*. (quoting *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005)). This deference is a reflection that the trial court is in the best position to judge the facts, ascertain family dynamics, and judge witness credibility. *Id*. "'But to the extent a ruling is based on an error of law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result.'" *Id*. (quoting *MacLafferty*, 829 N.E.2d at 941).

*Clary-Ghosh v. Ghosh*, 26 N.E.3d 986, 990 (Ind. Ct. App. 2015), *trans. denied*.

[6] In arguing that the trial court's order was clearly erroneous, Father claims that the evidence is insufficient to support the trial court's modification order because the evidence does not establish that modification of the parties' parenting time order was in the children's best interest. For her part, Mother argues that the evidence is sufficient to support the trial court's determination that modification of the parties' parenting time order was in the children's best interest. We agree with Mother.

[7] During the evidentiary hearing, Mother presented evidence which demonstrated that while largely acting in accordance with the parties' parenting time order, Father behaved in a manner that created situations which were not in the children's best interests. For instance, Mother testified that at least three days a week, Father would be waiting in the parking lot or at the front door when Mother arrived to drop L.S. off at school. When questioned about this behavior, Mother testified as follows:

> A:    Well, I'm obviously very uncomfortable. He, we have quite a history and my intent is to drop off my daughter so that I can get off to work. I have to be at work at 8:00 o'clock. So, I just walk in with [L.S.]. He'll follow us, follow right behind us. I'll take her to the gym. That's where the kids meet prior to going to their classrooms and while he's standing over me, I'm giving her hugs and telling her to have a good day and then I leave and he lingers for a few moments. Sometimes I see him leave.
> Q:    Now you know that [L.S] loves her father, right?
> A:    Of course.
> Q:    Do you see a different reaction when it's you walking in the school versus him coming to pick her up at her normal time?

Is there a different [L.S.] in the reaction between the, the, the, her reaction to seeing her father on school morning's versus when he's just there to pick them up on a regular parenting time?

A:     Yeah.  She's more clingy.  I think she probably senses my discomfort is my, is my interpretation of it, so she clings to me. It's harder for me to leave her on those mornings because she wants to hold on a little bit longer.

Q:     Do you think it's healthy for her?

A:     No I don't.

Q:     Do you think it's in the best interest of your child that three days out of the week he's showing up at school and walking in at the same time as you're trying to walk in with your child?

A:     I don't think that's best for her.

Tr. pp. 25-26.  The record further indicates that on at least two occasions, Father recorded video of Mother and L.S. as Mother escorted L.S. into the school gymnasium.

[8]     Mother also testified that often on the mornings following the children's mid-week overnight visit with Father, Father would drop the children off at Mother's home at 5:30 a.m. because he had to be at work before the children were to be dropped off at school.  On these mornings, the children would be forced to get up more than an hour earlier than their normal wake-up time, which was 6:45 a.m.  This change in the children's routine would leave them tired, exhausted, and "cranky."  Tr. p. 31.  Mother also indicated that as a result of being tired and cranky, I.S. has exhibited difficulty completing homework and studying for spelling tests which are given each week on Friday. Mother acknowledged that while she did not take issue with Father having mid-week overnight visitation, she did not think it was in the children's best interest

to be awakened so early on the mornings when Father could not arrange transportation to school for the children.

[9] Mother additionally testified about other issues stemming from Father's behavior which she believes have affected the best interests of the children:

A: Problems have been he doesn't, you know, he gets them every day after school but he doesn't return them consistently at five o'clock like he's supposed to. We argue about everything. I can't present anything to him without there being some kind of back and forth and it's beyond frustrating. Anytime – I try not to talk to him when I see him. He's yelled at me in front of the girls on drop offs before. There's been discrepancy over how he reads the Guidelines, how I read the Guidelines, how he interpretes [sic] them, what he thinks are his rights. There's been times where there's been special occasions that have come up on his, on my weekends which I had been fine with him taking the girls for, I just requested that he allow me to make up that time since it was my weekend and he refuses. There's no back and forth. There's no like flip-flops or whatever and to me that would be what's best for the kids. There's going to be stuff that comes up that's on my weekend that he wants to take the girls for and I don't have a problem with that. What I would like to see happen is "hey I've got this going on on Saturday, I'll bring them home a few hours early next week" and I'm fine with that. But there's none of that. He refuses to allow that kind of back and forth for what's best for the kids.
Q: Have there been occasion[s] where he just comes and parks outside of your house when it's not his time for the kids?
A: Yeah, he did.
Q: Can you tell me when that's occurred?
A: There was, there was special stuff going on that he wanted the girls for and I --
Q: When, when was it?
A: -- August 14th for the Cinderella Ball. He wanted to take

[I.S.] and I did not have a problem with that. All I requested was 'that's fine, it's my weekend. When can I make up that time since you're taking her on my weekend'? And he said I don't get to make up that time. He's just going to get her. It's a special event. That's all there is to it.

Q:   So when he put his foot down you put your foot down?

A:   Sure. I said then you're not going to take her. So he showed up --

Q:   And what happened that night --

A:   He showed up --

Q:   -- of the Cinderella Ball?

A:   -- yeah, he showed up that night anyways. Parked in my driveway for thirty minu[t]es and then left and then came back and sat in front of the – we live on a country road – so he sat out in front of the house on the country road in his car for thirty minutes. I finally called the police. It wasn't his weekend. It wasn't his time and him sitting out there – thank God the girls were in the back of the house and didn't see it and didn't have to be exposed to that. But he doesn't need to be sitting in front of my house when it's not his weekend, not his time.

Q:   Has there been history where he's showed up at your work as well?

A:   He has absolutely showed up at my work and sat in the parking lot demanding that I come out and talk with him. He sent letters to my employer telling them stuff about me; one, that wasn't true and, two, that was none of their business. My employer doesn't need to know what's going on in my personal life. It was beyond humiliating to have every Manager and Vice-President within Bona Vista[1] know about a situation that is none of their business but he sent that letter.

****

---

[1] As of the date of the evidentiary hearing, Mother, who had previously been employed by Bona Vista, was working as a case manager for the Department of Child Services.

A:      …   There was another incident where he wanted to get the girls early for breakfast and it was my morning and I thought it was, one of the girls had the day off of school so I had initially said that would be fine since so-and-so doesn't have school.  And then I looked at the calendar closer and realized that I'd made a mistake and said "oh, nevermind, I'll just take them to school" and he showed up anyways and sat in front of the house demanding to take the girls.  And that's the time when there's been altercations between he and my fiancé because he shows up uninvited.  He's on our property refusing to leave and absolutely John, my fiancé, --

Q:      Takes offense to that?

A:      -- yeah, absolutely.

Tr. pp. 33-35.  The record also reveals that while Father expected Mother to allow him to have the children for special events that occurred during Mother's parenting time, he demonstrated an unwillingness to grant Mother "make up" parenting time to balance the extra time granted to Father or to allow Mother to have the children for special events that occurred during his parenting time.  In fact, the record reveals that on at least one such occasion, Father threatened to deny Mother her parenting time on Christmas Day, as provided for by the Guidelines, if Mother would not grant Father extra parenting time over the Thanksgiving holiday.

[10]    Mother also objected to Father's desire to provide cellular phones for the children, who again were ages five and eight, so that he could call them as often as he wanted.  Mother indicated that she did not object to the children speaking to their Father whenever they wanted, but rather objected because she did not

think it was appropriate for five- and eight-year-old children to have cellular phones. Specifically, Mother testified as follows:

> Q:      At five and eight do you think your children should have access to some sort of phone to talk to their daddy whenever they want?
> A:      They can talk to their dad whenever they want. They've asked me to call him before and they call him. I've, I've never told them they can't call their dad. They'll just --
> Q:      They use your phone though, correct?
> A:      Absolutely they use my phone, yeah. Anytime they want. [I.S.] just lost a tooth. She was super excited. She called her dad. She called her grandma. She called his mom. I mean, she called everyone. I, I'm not going to tell them they can't call their dad. They love their dad.
> Q:      Well, what's the problem if dad gives them a cell phone[?] Tell me what your problem would be then.
> A:      I don't want to have to be responsible for a five and an eight year old's cell phone. I, they're not responsible enough to, to manage it. To keep track of it. We can't even keep track of socks and underwear in the house. I don't want to be responsible for a cell phone.
> Q:      What about letting him call every single day after he's had them every day? Do you think that's appropriate?
> A:      I don't think that's appropriate. I think there needs to be healthy boundaries in place. That's my time with the kids.
> Q:      So even though he has them every day, he insists on calling them every day? Does he call your house every day?
> A:      He hasn't in the last few months called every day like he was.
> Q:      Would it be fair to say that since [Father's counsel] has gotten involved things have settled down a little bit?
> A:      That's very accurate, yes.

Tr. pp. 40-41. Mother also testified that Father failed to discuss important decisions regarding the children with Mother or involve her in what she believed to be important moments in the children's lives. Specifically, Mother indicated that Father failed to consult with her about whether L.S. could get her ears pierced or invite Mother to attend when he took L.S. to do so. Mother also indicated that Father would remove all communications from the children's respective schools from the children's backpacks each day after school and would not share projects completed at school with Mother.

[11] With regard to the children's best interests, Mother testified as follows:

> A: The best interest of the kids is I want them to have a good relationship with their dad. I worry about his stability and I, I think the best thing for them is the every other weekend. He gets them one night over, you know, every week as well, on Wednesdays, and that that continues but not this every day where he and I are having to interact every single day. I don't want him showing up at the school in the mornings when I'm dropping [L.S.] off. He shows up at her lunch as well. So he gets that time in the middle of the day where I don't have to be there. He has lots of opportunities with those girls --
> Q: Does he do that every day for lunch?
> A: I don't know how frequently he goes to her school to see her for lunch but I know it happens.
> Q: You don't have any problem with that?
> A: I don't. Of course not.

Tr. p. 41. When pressed about the children's best interests by Father's counsel on cross-examination, Mother further testified as follows:

A:    I don't think it's in the best interest of the children to be exposed to our interactions every day. [Father] was a controlling, abusive, alcoholic in our marriage and that's why I left him and I'm scared of him. I'm doing what I can to provide positive interactions, which is just not talking to him, but the man scares me, sir, and so, no, I don't think it's in the best interest of the children.

Tr. pp. 52-53.

[12]    Again, in reviewing the trial court's order, we "must consider only the evidence most favorable to the judgment along with all reasonable inferences" which may be drawn therefrom. *See Ghosh*, 26 N.E.3d at 990. Upon doing so, we conclude that neither the trial court's findings nor its judgment is clearly erroneous. The evidence most favorable to the trial court's judgment is sufficient to support the trial court's determination that a modification of the parties' parenting time agreement was in the children's best interests. Father's claim to the contrary effectively amounts to an invitation for this court to reweigh the evidence, which we will not do. *See id.*

[13]    Further, we are unconvinced by Father's claim that the trial "court's referencing Mother's 'angst' as a reason for modifying the parting time schedule citation is completely unsupported by the record" because the "word was never used by Mother to describe her emotions at Father exercising his parenting time." Appellant's Br. p. 15. Mother testified that Father's actions made her uncomfortable, that she was afraid of Father, and that she believed the children could sense her discomfort. The term "angst" is defined as "a feeling of

anxiety." *See* Webster's Third New International Dictionary 84 (1964). Given Mother's testimony, it seems appropriate for the trial court to have referred to Mother's discomfort and fear as anxiety or angst.

[14] Father also challenges the trial court's use of the term "helicopter parent" in the modification order. We observe that with respect to this term, the modification order reads as follows: "Father was characterized as many things during [the evidentiary] hearing, but the court felt that the designation as a 'helicopter parent' was appropriate, given [F]ather's hovering over the children to excess." Order. After reviewing the evidence, we cannot say that the trial court's characterization of Father's actions as hovering over the children to excess was inappropriate. Father's "hovering" was not occasional, but rather occurred each day. In addition, Father's actions were such that his near-constant presence was affecting both Mother's and the children's mental health. We will not second-guess the trial court's characterization relating to Father's behavior. *See Ghosh*, 26 N.E.3d at 990 (providing that we give considerable deference to the findings of the trial court because the trial court is in the best position to judge the facts, ascertain family dynamics, and judge witness credibility).

[15] The judgment of the trial court is affirmed.

Pyle, J., and Altice, J., concur.