## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 15 2019, 6:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Luisa M. White
Lafayette, Indiana

Lesley A. Meade
Lafayette, Indiana

ATTORNEY FOR APPELLEE

Richard D. Martin
Frankfort, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Michael Bousum,

*Appellant-Petitioner,*

v.

Amber Bousum,

*Appellee-Respondent.*

July 15, 2019

Court of Appeals Case No.
18A-DR-2786

Appeal from the
Clinton Superior Court

The Honorable Justin H. Hunter,
Judge

Trial Court Cause No.
12D01-1109-DR-372

**Altice, Judge.**

# Case Summary

As part of their dissolution of marriage in 2012, Michael Bousum (Father) and Amber Bousum (Mother) agreed to joint legal and physical custody of their minor son, X.B. After Father learned of inappropriate sexual conduct occurring in 2017 between X.B. and Mother's then-boyfriend's two minor children, Father sought sole physical custody of X.B. Father now appeals the trial court's order that denied his request to modify custody, ordered him to pay weekly child support, and ordered him to pay a portion of Mother's attorney fees. Mother requests that this court assess appellate fees against Father for substantive and procedural bad faith.

We affirm.

# Facts & Procedural History

Mother and Father were married in 2007 and are the parents of one child, X.B., born in April 2008. Mother also has three older daughters, K.K. and twins, K.B. and F.B. In September 2011, Father filed a petition for dissolution of marriage. Due to contested custody, a guardian ad litem (GAL) was appointed, Judy Afflerbach, and she filed a report (Prior GAL Report) with the trial court. Thereafter, the parties entered into a Settlement Agreement that provided that the parties would share joint physical and legal custody of X.B. Because parenting time was equal and Father was paying certain expenses associated with X.B., the parties agreed that a deviation from the Indiana Child Support Guidelines was appropriate and "neither party shall pay any direct

support obligation to the other at this time." *Appellee's Appendix Vol. II* at 5. The Settlement Agreement provided that when X.B. reached school age, he would be enrolled in the Clinton Prairie school district. The trial court incorporated the parties' Settlement Agreement into the Decree of Dissolution and dissolved their marriage on October 29, 2012.

[4] At the time of the dissolution, Father was dating and living with Nicole, whom he later married.[1] Father and Nicole moved from Colfax, Indiana, which is in Clinton County, to a home in Clarks Hill, Indiana, in Tippecanoe County. At the time of the dissolution, Mother was dating and living with a man, who had a criminal history and was, according to Mother, an alcoholic. Mother ended that relationship in 2012, and at some point thereafter began dating Justin. Justin lived with Mother, and he exercised his alternating weekends of parenting time with his two minor children, son T.H. and daughter K.H., at the home he shared with Mother.

[5] On a Saturday in May 2017, nine-year-old X.B. shared with Mother that he and T.H, who was twelve, had engaged in sexually inappropriate behavior. T.H.'s eleven-year-old sister K.H. was also sometimes involved. Although X.B. asked Mother not to tell Father, she contacted Father that day, and they agreed to meet at the Frankfort office of the Indiana Department of Child Services (DCS) on the upcoming Monday. Mother went to the DCS office to make a report

---

[1] Nicole is Father's fourth wife.

and was instructed she had to call the 1-800 phone number to do so, which she did. Father was not at the DCS office, and when Mother contacted him, he told Mother that he had called the police reporting a suspected rape of X.B.

[6] Clinton County Sheriff's Department Detective Daniel Roudebush investigated. At DCS's recommendation, X.B. was forensically interviewed on May 22, 2017, at Quintin's House Advocacy Center. Detective Roudebush observed the interview. During his investigation, Detective Roudebush interviewed T.H. and K.H. and learned that there had been some incidents that occurred at Mother's residence and another incident involving two other children at a neighbor's home. Detective Roudebush learned that there appeared to have been ten to fifteen incidents between X.B. and T.H. and one or two more that also involved K.H. As to the incidents occurring at Mother's home, police believed they occurred mostly at night after Mother and Justin had gone to bed, but a couple of instances occurred during daytime hours.

[7] Meanwhile, believing that T.H, who was older and physically larger than X.B., had been bullying X.B. and that the sexual acts, which may have included anal penetration, had been forced upon X.B., Father took X.B. to the emergency room on May 22 for examination. The emergency room physical examination did not reveal any issues, but at the direction of emergency room personnel, Father took X.P. to the family pediatrician. At that doctor's recommendation, Father contacted a sexual trauma counselor, Jill Zimmer, for X.B. to begin counseling sessions. Father did not consult with Mother before taking X.B. to the emergency room, the pediatrician, or the initial meeting with Zimmer.

Mother learned of the counseling when she was informed that she needed to sign a release for X.B. to receive the counseling treatment.

[8] On June 2, 2017, Father filed a Verified Petition to Modify Custody, Parenting Time and Child Support and Request for Expedited Hearing (Petition to Modify). He also filed, in a separate court and on X.B.'s behalf, a request for protective order against T.H. In his Petition to Modify, Father asserted, in part, that he took X.B. to the emergency room on May 22 after X.B. had told him that he was sexually assaulted by Mother's boyfriend's twelve-year-old son and that it had been ongoing for a month, that DCS had been contacted, and that the Clinton County Sheriff's Department was currently investigating. Father further alleged:

> 5. The Mother is not meeting the medical, physical and psychological needs of the minor child while in her care and the child is not thriving under the current custodial arrangement.
>
> 6. There has been a substantial and continuing change of circumstances and it is now in the best interests of the minor child that the Father, Michael Bousum, be granted sole physical custody of his son.
>
> 7. That the court change parenting time at its discretion and what is in the best interest of the child.
>
> 8. That a modification in child support is warranted to reflect the new custodial arrangement.

*Appellant's Appendix Vol. II* at 29.  In August 2017, the trial court re-appointed GAL Afflerbach, subject to her acceptance, and directed the GAL to prepare a supplemental report.  GAL Afflerbach, however, declined the appointment.  On September 26, 2017, Cynthia Harmon was appointed as GAL in the case.

[9]     After conducting an investigation, Deputy Roudebush spoke to the county's chief deputy prosecutor, and it was determined that no criminal charges would be filed in the case, as "the activity appeared to be mutual in that it appeared to be exploration" and "while inappropriate," law enforcement did not believe it was criminal in nature, nor did they believe that there had been a lack of parental supervision or neglect.  *Transcript Vol. 1* at 46.  Detective Roudebush noted that, in his opinion, both parents displayed "appropriate responses, appropriate concerns for what was going on" and were "taking action and trying to correct it and mak[e] sure the right thing was done."  *Id.* at 48.

[10]    Similarly, DCS family case manager Morgan Smith determined that allegations of child abuse or neglect were unsubstantiated and that X.B. did not need services.  FCM Smith did not find any lack of supervision by either parent, but prepared a Safety Plan, to keep the children involved separated and, if together, supervised.  The Safety Plan also recommended that Justin's alternating weekends with T.H. and K.H. not correspond to X.B.'s time at Mother's home.  The Safety Plan recommended seeking counseling for the children involved.  On June 19, 2017, Mother, Justin, and the mother of T.H. and K.H. signed the Safety Plan.  Father did not, as he disagreed with the finding that the report was unsubstantiated.

[11] Sometime between the events of May 2017 and the fall of 2017, Mother and Justin ended their relationship, and he moved out of the residence. In October 2017, Mother moved from Colfax to Frankfort, Indiana. In November 2017, Mother's boyfriend, Richie, moved into her residence.

[12] X.B. continued to attend weekly counseling with Zimmer from June 2017 to December 2017, when he was released from treatment. The sessions usually were between Zimmer and X.B. only, but Father and Nicole participated in a couple of sessions. Mother took X.B. to a few sessions, but did not participate, as she believed she was not permitted to do so. Zimmer's diagnostic impression of X.B. was adjustment disorder unspecified.

[13] The trial court initially scheduled a hearing on Father's Petition to Modify for July 17, 2017, but it was continued a number of times and reset for April 11, 2018. On April 1, 2018, GAL Harmon emailed her report to counsel for both parties, and on April 2, 2018, she filed it with the court. Mother filed an Objection to Introduction of Guardian ad Litem Report and Request for Continuance of Hearing, asserting that the report was not timely filed prior to the scheduled hearing and that the report contained matters that occurred before the dissolution. On April 24, the trial court reset the hearing for May 24. On May 23, Mother filed an Objection and Motion to Strike References to Former Guardian ad Litem's Report and Recommendations in Report of Guardian ad Litem, arguing that the report included matters that occurred before the decree of dissolution and referred to the Prior GAL Report that "was never introduced in evidence, is not part of the record herein[.]" *Appellant's*

*Appendix Vol. II* at 69-70. Mother's Motion to Strike asked the trial court to strike or disregard references to the Prior GAL Report "and/or recommendation contained in the current Guardian Ad Litem Report." *Id*. at 70.

[14] The hearing on Father's Petition to Modify commenced on May 24, 2018, and continued on June 21 and August 28. Before the presentation of evidence, and after receiving argument from the parties on Mother's Motion to Strike, the trial court denied Mother's Motion to Strike. In doing so, the court observed that because the parties reached a Settlement Agreement during dissolution, "There wasn't [] a hearing to adjudicate the issue of custody. And so I [] think it is necessary that I understand a context." *Transcript Vol. 1* at 12.

[15] During the three days of hearings, Father called, among other witnesses, GAL Harmon. Her report was admitted over Mother's objection. In preparing her report and making her recommendation, GAL Harmon considered DCS's report, the parties' answers to interrogatories that she had sent them, medical records, X.B.'s forensic interview, and the Prior GAL report. She also spoke directly to Zimmer. She did not speak to Detective Roudebush or to DCS FCM Smith.

[16] GAL Harmon recommended that it was in X.B.'s best interest that the parties continue to share joint legal custody but that Father have primary physical custody of X.B. with Mother having, at a minimum, parenting time provided by

the Guidelines and at other times as the parties agree. When asked to explain what concerns led her to make that recommendation, she explained, in part:

> [T]here was extensive inappropriate behaviors going on between these children that should not have happened. I mean I know I heard the testimony that by both DCS and by the police that there was [] no neglect involved. Um and I would probably agree with that. But for something to . . . be able to go on that long and nobody catch it nobody notice it, that's disturbing to me. I was disturbed that DCS didn't substantiate at least do an informal adjustment and make sure all children involved received the counseling that they needed. . . . Um for a nine year old that the actions that I um saw in the report and from the forensic interview it was not just a little bit of exploration. To me it went well beyond that. And I think it was damaging to these children.

*Id*. at 67. GAL Harmon said there was nothing inappropriate about Mother's actual home, but felt that "situations" in her house may have made the misconduct between the children "easier to happen," observing that Mother "had gone through at least two relationships during the time of [her] investigation," which caused Harmon some concern. *Id*. at 68. GAL Harmon viewed it as a "pattern of behavior" that "can tend to cause more difficulties in a home and things can happen as they did" here. *Id*. at 71. GAL Harmon opined that being primarily with Father was in X.P.'s best interests for "stability, for watching for future problems," and if they do occur, "[Father]'s going to seek out the assistance and help" for X.B.'s needs. *Id*. at 76.

[17] Zimmer also testified for Father. She was a therapist with the Indiana Center for Children and Families, and she saw X.B. usually once a week. According

to Zimmer, X.B. shared with her that he sometimes felt bullied by T.H. and that T.H. and Justin had laughed at X.B. because he did not know what pornography or pole dancing was. Zimmer recalled that X.B. became physically ill and had to leave the room when describing an incident when he performed oral sex on T.H. at Mother's home. When asked why Father participated in some of X.B.'s sessions and Mother did not, Zimmer explained that Mother did not ask to participate and that she did not ask Mother back to join them based on X.B.'s wishes. Zimmer characterized X.B. as "a very emotionally intelligent" child, and she felt both parents were supportive of X.B. *Id.* at 137. In Zimmer's opinion, Father had the more stable home, which she based in part on the fact that X.B. had told her that Mother "had a lot of boyfriends at different times," and Zimmer felt that "if you have a lot of people moving in and out of the house" it can cause friction, tension, or a worse situation, as happened in the current case. *Id.* at 148.

[18]  Father testified that he and Nicole currently lived in a three-bedroom house in Clarks Hill, in Tippecanoe County, X.B. is his only child, X.B. has his own bedroom at the house, and Nicole has no children. Father testified to having concerns about the living arrangement at Mother's home, specifically her dating and bringing different men to live in the home. He at first did not have concerns with Justin living with Mother, but then began to believe that X.B. was being bullied by T.H. When he would raise his concerns to Mother, she would "play[] it off" and say "boys are boys." *Transcript Vol. 2* at 9, 11. Father acknowledged that without notifying Mother, he took X.B. to the emergency

room, the pediatrician, and then for an initial consultation with Zimmer, but he explained that Mother was out of town on vacation and that his focus at that point "was completely on X.B." *Id.* at 20.

[19]    Father's main concern with Mother and her parenting was that "at times she is more self oriented than family oriented," moving from one boyfriend to another, such that his concern is "who's gonna live there next," and that this had been "an ongoing concern." *Id.* at 25. On cross-examination, Father acknowledged that he was "perturbed" with FCM Smith and DCS about their conclusion that the matter was "unsubstantiated" and that he was told by FCM Smith to speak to her supervisor in any future communication. *Id.* at 33. Father agreed that X.B. was released by Zimmer but that he believed X.B. suffered trauma as a result of what occurred between X.B. and Justin's children and that he had concerns for X.B.'s mental state in terms of issues that may "show up in the future." *Id.* at 40.

[20]    Father testified that he works for Frito Lay as a maintenance mechanic from 7:00 a.m. to 3:30 p.m., making $31.88 per hour, and that he usually works forty-eight hours per week. He stated that, year to date, he had earned $62,000, and in 2017, he made around $90,000. He stated that neither he nor Mother were currently living in the Clinton Prairie school district, although X.B. had been continuing to attend school there, with Mother's older daughters driving him to school. Father stated that, if he were to gain primary custody, X.B. would get picked up by a bus and go to the Tippecanoe County school district.

[21] Mother testified that in October 2017 she moved from Colfax to Frankfort, where she rents a five-bedroom home, in which her three daughters and one grandchild also live, along with her boyfriend Richie, who has no children. X.B. has his own bedroom at her home. Mother described that X.B. has a very good relationship with her older daughters.

[22] Mother stated that when X.B. told her about the inappropriate contact, she separated the kids, and she and Justin tried to talk with them about it, but they were not forthcoming with information. She stated that she promptly told Father, although X.B. had asked her not to. She and Father agreed to meet at DCS but Father instead took X.B. to the emergency room without telling her. She also was not told about the pediatrician or the counselor, until she was contacted to sign release papers. Mother testified that Father had told her she would not be allowed to participate in counseling, which Father denied having said. Around the same time as all of this was happening, Mother had a pre-planned trip to North Carolina to see her grandmother, and DCS told her to go and take X.B., to keep his life normal, but that Father would not let her take X.B. on the trip. She signed DCS's Safety Plan, although she "thought it was a little much," given that the children were not "ever gonna be around each other again." *Transcript Vol. 1* at 210.

[23] With regard to the conduct between X.B. and Justin's children, Mother stated that she did not believe X.B. was the victim of bullying or sexual assault, as Father asserted. Rather, in her view,

[T]hree children participated in acts that they were not suppose [sic] to participate in. [X.B.] fully participated with the other two children as well. He did things to a little girl.[2]

*Id.* at 246. Mother testified that she had no further concerns about what occurred because she was no longer dating Justin and X.B. was no longer around T.H., and X.B. had been cleared from a therapist. Mother presented evidence that X.B.'s grades had not suffered as a result of the situation, that he was doing well, attending school, and participating in football. She believed that it was in X.B.'s best interests for the joint physical custody arrangement to continue.

[24]    Mother asked the trial court to order Father to pay child support. She testified that she also works at Frito Lay, where she has worked for the last six years and, previously, for another seven years. Mother testified that she works in the sanitation department and earns $18.36 per hour. Mother offered a proposed child support worksheet, which was admitted over Father's objection at the hearing.

[25]    The trial court took the matter under advisement, and the parties each submitted proposed findings of fact and conclusions. The trial court issued its Findings of Fact, Conclusions of Law and Order on September 24, 2018, denying Father's request to modify custody. It found that Father had failed to

---

[2] Mother later clarified that she was referring to K.H.

establish a change in the Ind. Code § 31-17-2-8 factors and failed to establish that a modification of the existing custody arrangement was in X.B.'s best interests. The trial court granted Mother's request to establish child support, ordering Father to pay $106 per week. The court found that Father was in arrears in the amount of $6572 due to retroactive modification and ordered Father to pay an additional $25 per week toward the arrearage. It also ordered Father to pay $4500 in attorney fees to Mother's counsel. Father filed a motion to correct error, which the trial court summarily denied. Father now appeals.

## Discussion & Decision

[26]     At Mother's request, the trial court in this case entered special findings of fact and conclusions thereon pursuant to Trial Rule 52(A). Our review of such findings and conclusions is two-tiered. *Coulibaly v. Stevance*, 85 N.E.3d 911, 915 (Ind. Ct. App. 2017). First, we consider whether the evidence supports the findings, and second, whether the findings support the judgment. *Id*. The trial court's findings and conclusions will be set aside only if they are clearly erroneous—that is, where a review of the record leaves us with a firm conviction that a mistake has been made. *Id*. at 915-16. In conducting our review, we will neither reweigh the evidence nor judge the credibility of witnesses. *Id*. at 916. Instead, we consider only the evidence favorable to the trial court's judgment. *Id*.

# I. Child Custody

Father contends the trial court should have granted his request to modify custody. We review the trial court's decision to modify custody for an abuse of discretion, giving wide latitude and deference to the trial court. *Collyear-Bell v. Bell*, 105 N.E.3d 176, 183 (Ind. Ct. App. 2018) (citing *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). We do not reweigh the evidence or judge the credibility of the witnesses. *Kirk*, 770 N.E.2d at 307. It is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal. *Id.*

Pursuant to Ind. Code § 31-17-2-21, a trial court may not modify an existing custody order unless the modification is in the best interests of the child and there has been a substantial change in one or more of the statutory factors set forth in I.C. § 31-17-2-8. *Collyear-Bell*, 105 N.E.3d at 184. Those factors include:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian[.]

Thus, to support custody modification under I.C. § 31-17-2-21, the following is required: (1) a finding by the trial court that change would be in the child's best interests, (2) a consideration of the factors listed above, and (3) a finding that there has been a substantial change in one of those factors. *Collyear-Bell*, 105 N.E.3d at 184.

### a. Prior GAL Report

[29] Father raises a number of challenges to the trial court's decision to deny his Petition to Modify, one of which is that the trial court erred when it gave limited consideration to matters in GAL Harmon's report concerning the Prior GAL Report. In particular, Father challenges the trial court's Findings of Fact 6 and 7 and Conclusion 8 which state:

> 6. The former Guardian Ad Litem's report was not admitted into evidence and the parties did not have an opportunity to cross-examine Ms. Afflerbach regarding her report and recommendations.

> 7. The Court previously denied Mother's Motion to Strike related to the former Guardian Ad Litem's report and recommendations, but gives limited weight to any testimony or references to the former Guardian Ad Litem's report and recommendations.

> * * * *

> 8. The prior Guardian Ad Litem's (Judy Afflerbach) report was not received in evidence at a hearing at which the parents had a right to cross-examine said Guardian Ad Litem with respect to her recommendation; *Keen v. Keen*, 629 N.E.2d 938, 940 (Ind. Ct. App. 1994)

*Appellant's Appendix Vol. II* at 18, 24.

[30] We find no reversible error with regard to these findings and conclusion or with the trial court's manner of handling the Prior GAL Report. The findings and conclusion correctly observe that the Prior GAL Report was never admitted

into evidence (having only been filed with the court prior to the decree) and, because it was never presented at a hearing, its author was never subject to cross-examination. Furthermore, as Finding 7 recognizes, when Mother sought to strike Harmon's GAL Report or portions of it that referred to the Prior GAL Report, the trial court *denied* Mother's request, thus allowing those references to remain in Harmon's report, which the trial court admitted.

[31] At the hearing, when Mother "renew[ed] [her] objection as to references to the [Prior GAL Report]" the trial court sustained the objection, because it had never been admitted in evidence, but stated:

> [C]ertainly [Harmon] can consider it. It helps her understand the context. . . . but . . . I don't know that I have to hear the specifics of that [Prior] GAL Report . . . that were . . . not admitted to evidence. It may have been filed with the Court but not admitted to evidence in any prior hearing. So you may continue with questions just not uh specifically like ["]hey What did that say["] . . . kind of thing[.]

*Transcript Vol. 1* at 69. Thus, the trial court found that it was permissible for GAL Harmon to consider the Prior GAL Report when making her recommendation,[3] but found it neither necessary nor appropriate for Harmon to testify as to the specific contents thereof. Father has not established that the

---

[3] We note that I.C. § 31-17-2-12(b), regarding a court-ordered investigation and report in child custody matters, provides, in part: "In preparing a report concerning a child, the investigator may consult any person who may have information about the child and the child's potential custodial arrangements. . . . [T]he investigator may consult with and obtain information from medical, psychiatric, or other expert persons who have served the child in the past without obtaining the consent of the parent or the child's custodian."

trial court's decision was clearly erroneous. Father additionally challenges that – as stated in Finding 7 – the trial court gave Harmon's references to the Prior GAL Report "limited weight." *Appellant's Appendix Vol. II* at 18. However, it was well within the trial court's discretion to determine what weight to give such evidence.

[32] Father also claims that the trial court should have taken judicial notice of the Prior GAL Report. While Ind. Evidence Rule 201(a)(2)(C) permits trial courts to take judicial notice of court filings and contents of pleadings in the case before it, we find no authority that a trial court is required to do so, nor does Father provide any. In this case, the trial court permitted GAL Harmon to rely on and refer to the Prior GAL Report when preparing her own report, which it admitted into evidence. Father has not established any error with the trial court's decision to not take judicial notice of the Prior GAL Report.

### b. Sustaining Objections / Mother's Prior Conduct

[33] In a related vein, Father contends that the trial court erred "in sustaining [Mother's] objections to testimony and evidence [regarding matters] that occurred [] before the last court order." *Appellant's Brief* at 20. Father does not identify what specific evidence was offered and excluded, or the basis of any objections, only citing generally to Transcript Vol. I pages "69149-150[,]" *id*. at 22, presumably referring to pages 69 and 149-50. This is an insufficient basis to challenge the trial court's evidentiary rulings, and the issue is waived. Ind. Appellate Rule 46(A)(8); Ind. Evidence Rule 103(a)(2).

[34] Waiver notwithstanding, we recognize that the gist of Father's claim is that the trial court should have allowed more testimony about matters that occurred prior to the dissolution decree, in particular with regard to what he claims was Mother's "pattern of behavior [and] lifestyle choices" that "began before [the Decree] and continued after" and "caused a substantial change" in the I.C. § 31-17-2-8 factors. *Appellant's Brief* at 11-12. He challenges the trial court's Conclusions 3, 5, and 6, which state, in part:

> 3. In considering these factors, the trial court's inquiry is strictly limited to consideration of changes in circumstances which have occurred since the last custody decree.
>
> * * *
>
> 5. It is a well settled rule of law that the modification hearing cannot be used to retry the issues settled by the divorce decree....
>
> 6. Evidence of conduct of the parties prior to the entry of a Decree of Dissolution is properly excluded.

*Appellant's Appendix Vol. II* at 23 (quotations and citations omitted). Father asserts that these conclusions "fail to consider" I.C. § 31-17-2-21(c) (Subsection 21(c)), which provides that a trial court "shall not hear evidence on a matter occurring before the last custody proceeding . . . unless the matter relates to a change in the factors relating to the best interests of the child as described in [I.C. § 31-17-2-8.]" *Appellant's Brief* at 21. The trial court did not ignore

Subsection 21(c), as Father claims, as it expressly included that language elsewhere in its conclusions, namely in Conclusion 4.[4]

[35] Father also argues that Conclusions 3, 5, and 6, and the trial court's manner of limiting evidence of matters occurring prior to the dissolution, were in conflict with *Dwyer v. Wynkoop*, 684 N.E.2d 245 (Ind. Ct. App. 1997), *trans. denied*. In that case, this court stated:

> [W]hen parents stipulate as to who will have custody of the child and the trial court grants a summary dissolution on the basis of such agreement without hearing evidence on the issue of custody, there is no "custody proceeding" that would activate [Subsection 21(c)] . . . Thus, this section does not apply to situations where custody was originally determined solely by stipulation of the parties.

*Id*. at 249. Father maintains that, pursuant to *Dwyer*, evidence of conduct prior to the dissolution would be new and material information and should have been allowed to be presented to the court and that, here, the court acted in contravention of *Dwyer*. We disagree.

[36] First, as stated above, Father has not specifically identified what evidence, other than the Prior GAL Report, which we have already addressed, should have been admitted or more fully allowed to be discussed. Second, and as Mother

---

[4] Conclusion 4 states: "Pursuant to Indiana Code § 31-17-2-8(c) [sic], '[T]he Court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of a child as described in [I.C. 31-17-2-8] and, if applicable [I.C. 31-17-2-8.5]." *Appellant's Appendix Vol. II* at 23-24.

observes, some testimony on the subject of Mother's past boyfriends or prior conduct was, in fact, admitted. *See e.g.*, *Transcript Vol. 1* at 68 (Mother's past relationships), 239-41 (men living in her home and any criminal histories). Third, even if as Father claims it was error for the trial court to not more fully receive evidence on matters prior to the agreed dissolution, Father has not shown that, if admitted, such evidence would "positively require" a change in custody. *Kirk*, 770 N.E.2d at 307. Thus, we find any error was harmless.

### c. Standard for Modification

[37]  Father also asserts on appeal that, in deciding whether to modify custody, the trial court applied "the wrong legal standard" and, more specifically, applied one that was more stringent than what I.C. § 31-17-2-21 requires. In support of his argument, he points to Conclusion 10, which states:

> "Moreover, the non-custodial parent must show something more than isolated acts of misconduct by the custodial parent to warrant a modification of child custody; the non-custodial parent must show that changed circumstances regarding the custodial parent's stability and the child's well-being are substantial." Wallin, 668 N.E.2d [259,] @261 [(Ind. Ct. App. 1996)] citing Simons v. Simons 566 N.E.2d 551, 555 (Ind.Ct.App.1991)[.]

*Appellant's Appendix Vol. II* at 25. He argues that requiring a parent to show "that changed circumstances regarding the custodial parent's stability and the child's well-being are substantial" is not an accurate statement. We agree with Father to the extent that this portion of Conclusion 10 somewhat muddles the correct standard, but we find that the remainder of the court's findings and

conclusions state that, pursuant to I.C. § 31-17-2-21, a modification requires a showing of a substantial change in at least one of the statutory factors of I.C. § 31-17-2-8, which section the court then fully sets out, as well as a showing that modification is in the child's best interests. We find that, considering the order in its entirety, any misstatement in Conclusion 10 is not fatal to the court's decision.

### d. Findings as Unsupported by Evidence

[38] Father also challenges the denial of his request for modification by asserting that Findings 22, 28, 33, and 35 are not supported by the evidence. Finding 22 states: "The DCS prepared a safety plan which specified that [X.B.] would not be in the presence of [Justin's] children." *Appellant's Appendix Vol. II* at 20. His quarrel is that the Safety Plan does not actually state that they not be in each other's presence; rather, it directs that the children be supervised when they are together. We are unpersuaded that Finding 22 is a clearly erroneous finding, as Father claims, and conclude that this technical distinction does not render Finding 22 as unsupported by the evidence.

[39] Finding 28 states: "Both the Father and Guardian Ad Litem Harmon speculate, without any evidence in support thereof, that the [Mother] failed to adequately supervise [X.B.]." *Id*. Father maintains that GAL Harmon was not speculating because her concerns were based on, among other things, the forensic interview, DCS records, and medical records. GAL Harmon testified that she was disturbed that extensive and inappropriate touching went unnoticed. More specifically, she said "I just find it very hard to believe that

activities of this nature could go on . . . for the period of time and the amount without anyone's knowledge or suspicion." *Transcript Vol. 1* at 83. On cross-examination, she acknowledged that she was speculating as to the belief that someone should have known. Thus, the trial court's Finding 28 was supported by the evidence.

[40] Father also argues that the evidence did not support Findings 33 and 35, which concerned where X.B. did or would attend school, and stated:

> 33. Father's proposed modification would result in [X.B.] changing schools.
>
> * * *
>
> 35. It is not in [X.B.]'s best interest to modify the existing custody arrangement or to change his schooling from Clinton Prairie.

*Appellant's Appendix Vol. II* at 21. Father maintains these are "erroneous on their face" because it is undisputed that neither parent lives in Clinton Prairie school system and, thus, "it does not follow that Father's proposed modification would result in X.B. changing schools." *Appellant's Brief* at 28. The evidence, however, was that X.B. had been attending Clinton Prairie school even though neither parent was still living in that district and that Mother's older daughters took him to school. Father testified that, if he were awarded primary custody, then X.B. would begin attending school in the district where Father lived in Tippecanoe County and would ride the bus. Father has not shown that the findings were unsupported by the evidence.

### e. I.C. § 31-17-2-8 Factors

[41]    Father also argues that the denial of his petition to modify was erroneous because the trial court failed to consider all relevant factors under I.C. § 31-17-2-8. In particular, Father notes that the trial court's findings and conclusions "are wholly void of relevant testimony of" Zimmer and GAL Harmon. *Appellant's Brief* at 24. Father's argument in this regard is essentially a request to reweigh the evidence, which we cannot do. We recognize that Zimmer and GAL Harmon presented testimony and evidence that supported Father's position in favor of modification, namely that he had the more stable home and that each recommended that he have primary physical custody. The trial court heard that evidence, along with all the other evidence, and denied Father's Petition to Modify. This is not a case where the trial court failed to consider the necessary statutory factors; indeed, its order stated that it did consider the factors. It simply determined that Father "failed to establish the requisite change in any of the factors outlined in Indiana Code 31-17-2-8." *Appellant's Appendix Vol. II* at 20. Father has not established that this determination was clearly erroneous.

[42]    Indeed, Mother presented evidence that, upon learning of the inappropriate conduct, she promptly contacted Father and arranged to make a report to DCS, which she did. Father unilaterally took X.B. to the emergency room, the pediatrician, and a counselor. Mother agreed to the counseling, once she learned of it, but did not participate because, according to Mother, Father told her she was not allowed to. Mother did not believe that this was a situation in which X.B. had been bullied and was the victim of sexual assault. She agreed

with Detective Roudebush and DCS that it was a situation that was definitely inappropriate and needed to stop, and that precautions should be taken to keep the children supervised at all times if together, but that it did not warrant criminal charges or DCS involvement. Mother ended her relationship with Justin, and she moved to a new town. She said X.B. was doing well in school and participating in football. While Father's proposed modification would require X.B. to change schools, she stated that she would try to keep X.B. attending Clinton Prairie schools, with her daughters continuing to transport him, until they graduated at semester, at which time she would secure other arrangements.

[43] Father's Petition to Modify had asserted that X.B. was "not thriving under the current custodial arrangement." *Appellant's Appendix Vol. II* at 29. The trial court decided otherwise, and based on the record before us, we cannot say that its decision was clearly erroneous. Accordingly, we affirm the trial court's decision to deny Father's Petition to Modify.

## II. Child Support

[44] Father challenges the trial court's order of child support. "Decisions regarding child support rest within the sound discretion of the trial court." *Taylor v. Taylor*, 42 N.E.3d 981, 986 (Ind. Ct. App. 2015), *trans. denied*. We reverse child support determinations only if the trial court abused its discretion or made a determination that is contrary to law. *Id.*

[45] Here, the court ordered Father to pay child support in the amount of $106 per week. Initially, Father claims that the trial court should not have entered a support order in favor of Mother because "Mother never filed a cross motion to modify support[.]" *Appellant's Brief* at 32. We reject Father's argument. Father's Petition to Modify asked the trial court to modify custody and order child support, asserting that "a modification in child support is warranted to reflect the new custodial arrangement." *Appellant's Appendix Vol. II* at 29. At the hearing, Mother requested that the court not modify the joint custody arrangement, but establish an order of support (as none has been provided in the parties' Settlement Agreement), and she submitted a proposed child support worksheet that was admitted over Father's objection. Both parties testified to their respective incomes, and Father later submitted a child support order with the court.[5] Given this record, the matter of child support was squarely before the court, and it was not error for the trial court to order child support.

[46] Father also asserts that the trial court erred in its calculation of child support.[6] Child support calculations are made utilizing the income shares model set forth in the Indiana Child Support Guidelines. *In re Marriage of Duckworth*, 989

---

[5] The record indicates that Father emailed his proposed findings of fact and conclusions of law, along with a proposed child support worksheet, to the court on September 19, 2018.

[6] Father suggests that the trial court's "wholesale adoption" of Mother's proposed findings of fact and conclusions caused or at least contributed to the allegedly-erroneous calculation of child support. *Appellant's Brief* at 29. As Father acknowledges, trial courts are permitted to adopt proposed findings. As Father further recognizes, the trial court here, made a number of minor technical changes or additions to Mother's proposed findings and conclusions. We find that the trial court's actions – to revise even small matters with which it did not agree – reflect the court's careful review of the proposed findings. Father has failed to establish any error with the trial court's use of Mother's proposed findings and conclusions.

N.E.2d 352, 354 (Ind. Ct. App. 2013). These Guidelines apportion the cost of supporting children between the parents according to their means. *Id.* A calculation of child support under the Guidelines is presumed valid. *Id.* Indiana Child Support Guideline 3A(1) provides in part that "weekly gross income" is defined "as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon 'in-kind' benefits" and that "[w]eekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, [and] dividends ...." *Marshall v. Marshall*, 92 N.E.3d 1112, 1117 (Ind. Ct. App. 2018).

[47] Father specifically challenges Findings 38, 39, 43, 44, which state:

> 38. The Father works at Frito Lay in the maintenance department, earning in excess of ninety-thousand dollars ($90,000) in 2017.

> 39. For child support purposes, the Court finds Father's income to be $1,693.73 per week.

> 43. Effective July 16, 2017, Father shall pay to Mother, by means of an Income Withholding Order, child support in the sum of $106.00 per week.

> 44. As of September 21, 2018, Father is in arrears in his child support obligations due to the retroactive modification in the sum of $6,572, which arrears shall be paid at the rate of $25.00 per week until paid in full.

*Appellant's Appendix Vol. II* at 21-22.

[48]     In particular, Father claims that the court's computation of his weekly gross income erroneously included overtime. Upon review, however, we find no error in the court's determination of support, which was in accordance with Mother's proposed child support worksheet. Her worksheet calculated Father's weekly gross income at $1693.73 per week, which extrapolates to $88,036 per year.[7] Father testified that his income was approximately $90,000 in 2017, which would calculate to $1730.77 per week. He also testified that, as of the August 28, 2018 hearing, he had earned approximately $62,000 year to date, which – based on having been paid for 35 weeks of the year – calculates to $1771 per week. Furthermore, while Father testified that he earns $31.88 per hour and generally works 48 hours per week, he agreed that he sometimes works up to 56 hours per week. Given the record before us, Mother's proposed weekly gross income amount for Father of $1693.73 was within the scope of the evidence presented.

[49]     Father also contends that the trial court erroneously ordered retroactive support "to a date that the Chronological Case Summary shows nothing being filed to base a retro[]active date on[.]" *Appellant's Brief* at 33. Under Indiana law, "'A trial court has the discretionary power to make a modification for child support relate back to the date the petition to modify is filed, or any date thereafter.'"

---

[7] Father's proposed child support worksheet assigned him weekly gross income of $1530 ($31.88 per hour at 48 hours per week), or $79,560 per year.

*Taylor v. Taylor*, 42 N.E.3d 981, 986 (Ind. Ct. App. 2015) (quoting *Haley v. Haley,* 771 N.E.2d 743, 752 (Ind. Ct. App. 2002), *trans. denied*. A "retroactive modification of support is erroneous only if the modification purports to relate back to a date earlier than that of the petition to modify." *Id*.

[50] Here, the trial court found that, as of September 21, 2018, Father "is in arrears in his child support obligation" in the amount of $6572 "due to retroactive modification[,]" but the court's order does not identify a specific date when the retroactive child support obligation commenced. *Appellant's Appendix Vol. II* at 22. Father maintains that the retroactive date was July 16, 2019, *Appellant's Reply Brief* at 15, whereas Mother asserts that it was June 2, 2017, *Appellee's Brief* at 44. We make no determination as to the date, but find that the trial court was within its discretion to order a support obligation to begin as early as June 2, 2017, when Father filed his Petition to Modify. In sum, Father has not shown any abuse of discretion in the trial court's child support determination.

## III. Attorney Fees

[51] Father challenges the trial court's award of attorney fees in favor of Mother. The trial court may periodically order a party to pay a reasonable amount for the cost to the other party of maintaining or defending a proceeding, including attorney fees. *See* I.C. § 31-17-7-1 (regarding custody issues); I.C. § 31-16-11-1 (regarding child support issues). A determination regarding attorney fees in family law matters is within the sound discretion of the trial court and will be reversed only upon a showing of a clear abuse of that discretion. *Bean v. Bean*,

902 N.E.2d 256, 266 (Ind. Ct. App. 2009). In determining whether to award attorney fees, the trial court must consider the parties' resources, their economic condition, their ability to engage in gainful employment, and other factors that bear on the award's reasonableness. *Id.* The court may also consider any misconduct on the part of either of the parties. *Martinez v. Deeter*, 968 N.E.2d 799, 810 (Ind. Ct. App. 2012). The trial court need not cite the reasons for its determination. *Bean*, 902 N.E.2d at 266.

[52] Here, the trial court ordered Father to contribute $4500 towards Mother's request for attorney fees in the sum of $8500 (Exhibit F). Father argues that the trial court abused its discretion when it ordered him to pay a portion of Mother's attorney fees because Mother has a steady income and, further, "there lacked testimony that [] Mother endured a hardship in paying her attorney." *Appellant's Brief* at 28. We find no abuse of discretion, however, with the trial court's decision. The court heard evidence of the parties' respective incomes, with Father earning $31.88 per hour and Mother earning $18.36 per hour. Father earned in excess of $90,000 in 2017. Mother had three prior-born daughters living in her home (two were still minors), along with a grandchild. Mother testified that she had incurred attorney fees in connection with Father's Petition to Modify and that she did not have the financial means to pay those fees.

[53] The trial court determined that, "[b]ased upon the substantial disparity in the parties' incomes and financial conditions and the nature of the litigation, the Father should contribute to Mother's reasonable attorney fees." *Appellant's*

*Appendix Vol. II* at 22. We conclude that the trial court did not abuse its discretion in this determination.

## IV. Cross Appeal: Appellate Fees

Mother asks us to assess appellate attorney fees against Father pursuant to Ind. Appellate Rule 66(E) for substantive and procedural bad faith. The discretion to award fees under this rule is limited to instances when an appeal is "permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). "To prevail on a substantive bad faith claim, the party must show that the appellant's contentions and arguments are utterly devoid of all plausibility." *Id.* Procedural bad faith "occurs when a party flagrantly disregards the form and content requirements of the Rules of Appellate Procedure, omits and misstates relevant facts appearing in the record and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court." *Id.*

Mother argues that Father's statement of facts was deficient, failed to include facts favorable to the judgment, and was argumentative, requiring Mother to spend time and expense to provide an appropriate statement of facts. Mother also argues, among other things, that Father "failed to support many of his contentions with cogent argument or citations to caselaw or the record." *Appellee's Brief* at 47. As Father observes, while App. R. 66(E) provides this court with the discretionary authority to award fees on appeal, we must use

"extreme caution" when exercising this power because of a potential chilling effect upon the exercise of the right to appeal. *Gilbert v. Gilbert*, 7 N.E.3d 316, 324 (Ind. Ct. App. 2014). We conclude that, even if Father's brief contained flaws, as Mother claims, any shortcomings were not so flagrant or significant as to constitute bad faith or vexatiousness. We thus decline to award Mother appellate attorney fees.

[56] Judgment affirmed.

Kirsch, J. and Vaidik C.J., concur.