

FILED

Aug 12 2025, 8:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

In Re: The Paternity of A.B., N.W., and B.W. (Minor Children);

Johnathan Brown (Father),

*Appellant-Respondent*

v.

Amy Warren (Mother),

*Appellee-Plaintiff*

---

August 12, 2025

Court of Appeals Case No.
24A-JP-1833

Appeal from the Hamilton Superior Court

The Honorable Michael A. Casati, Judge
The Honorable Erin M. Weaver, Magistrate

Trial Court Cause Nos.
29D01-1601-JP-128
29D01-1601-JP-129
29D01-1910-JP-1555

**Pyle, Judge.**

## Statement of the Case

[1] In this paternity action, the trial court issued an order: (1) denying Johnathan Brown's ("Father") motion to modify child support; and (2) finding him to be in contempt for failing to pay Amy Warren ("Mother") (collectively "Parents") for their children's past extracurricular activities. Father argues that the trial court: (1) clearly erred when it denied his motion to modify child support; and (2) abused its discretion when it found him to be in contempt.

[2] Concluding that the trial court: (1) clearly erred when it denied Father's motion to modify child support; and (2) abused its discretion when it found Father to be in contempt, we reverse and remand with instructions for the trial court to: (1) hold a hearing for additional evidence to be presented on the relevant factors that the trial court should consider when determining Father's potential income and to adjust its order as necessary to impute an appropriate level of potential income to Father based on that evidence; and (2) vacate that portion of its order that found Father in contempt for failing to pay Mother for their children's past extracurricular activities.

[3] We reverse and remand with instructions.

## Issues

1. Whether the trial court clearly erred when denied Father's motion to modify child support.

2. Whether the trial court abused its discretion when it found Father to be in contempt for failing to pay Mother for the children's past participation in extracurricular activities.

## Facts

Mother and Father are the parents of daughter A.B. ("A.B."), who was born in March 2009; son, N.W. ("N.W."), who was born in January 2015; and daughter, B.W. ("B.W.") (collectively "the children") who was born in September 2017. Mother and Father never married, but Father signed paternity affidavits for the children.

In March 2020, Parents agreed to the entry of a mediated agreed order ("the Agreed March 2020 Order"), which provides, in relevant part, as follows:

1. The parties shall be awarded joint legal custody of the children. Both parents shall consult with each other and cooperate in making decisions regarding the children. In the event of a dispute, Mother shall retain ultimate decision-making authority and responsibility.

   The parents will share authority and responsibility for the major decisions concerning the children's upbringing, including the children's education, health care, and religious training. The parents will equally and mutually share and participate in all parental responsibilities and decision-making for the children except for routine

decisions. All decisions which do not fall into the above category of "routine decisions" will be made only with the ***prior consent and approval of both parents***, except that in the case of an emergency where there is not time for parents to confer, either parent shall make the necessary decisions. . . . Included among the types of decisions which are not "routine decisions". . . are decisions relating to . . . selection of extra-curricular activities such as clubs, organizations, [and] athletic activities . . . .

\* \* \* \* \*

5. . . . Father shall pay child support in the amount of Five Hundred Fifty Dollars ($550) per week . . . .

\* \* \* \* \*

8. The parties shall each be responsible for the children's extracurricular and sports expenses on a pro-rata basis (currently 75-25%).[1]

(App. Vol. 2 at 80, 82, 83) (emphasis added).

[6] When the parties agreed to the entry of the Agreed March 2020 Order, Father, who has a background in roofing and roofing sales, was in the process of relocating to Kansas to take a regional director position with American Dream Home Improvement ("American Dream"). At the time, Father earned $180,000 per year.

[7] In January 2022, Father and his wife ("Father's wife") purchased a $400,000 home in Greenfield, Indiana. Father's wife, who had been in the military, was

---

[1] Father was to pay 75% of these expenses, and Mother was to pay 25% of these expenses.

able to obtain a VA loan. Father was still working for American Dream at the time that he and his wife purchased the home and relocated to Greenfield.

[8] Also, in January 2022, Mother filed a petition to modify child support and a motion for rule to show cause, wherein she argued that Father was in contempt because he had "not paid his share of the children's extracurricular expenses in conformity with" the Agreed March 2020 Order. (App. Vol. 2 at 87). She asked the trial court to order Father "to . . . show cause why he should not be found in contempt as a result of his failure to pay his share of the children's extracurricular expenses as ordered" and to award her the attorney fees that she had incurred as a result of filing the petition. (App. Vol. 2 at 87-88).

[9] The following month, February 2022, Father filed a petition to modify child support, custody, and parenting time. In his petition, Father explained that he had relocated to Greenfield, and he asked the trial court "to order shared physical custody with a week on week off schedule." (App. Vol. 2 at 90). He also asked the trial court to modify child support to reflect any changes in his overnight parenting time and in Parents' incomes.

[10] Two months later, in April 2022, Father filed a petition for contempt citation, wherein he alleged that in March 2022, Mother had denied him parenting time with A.B. Father further alleged that in April 2022, Mother had denied him parenting time with the children and that he had gone eighteen days without seeing them. He asked the trial court to find Mother in contempt of the Agreed

March 2020 Order, to order make-up parenting time, and to order Mother to pay him the attorney fees that he had incurred in filing the petition.

[11] Three months later, in July 2022, Mother filed a second petition for rule to show cause, wherein she alleged that Father had "unilaterally kept the children at the conclusion of his parenting time period on Sunday, July 24, 2022, in violation of the current order, thereby denying [her] parenting time with the children." (App. Vol. 2 at 95). Mother asked the trial court to award her make-up parenting time as well as the attorney fees that she had incurred in filing the petition.

[12] In September or October 2022, Father and other American Dream employees, including the vice president, the national director, and the other regional directors, were all terminated from American Dream because of their high salaries. Father was unable to find a comparable position at the same salary in the Greenfield area. He attempted to find a lesser paying position in the area but was told that he was overqualified. Father and his wife eventually started their own roofing business, Showtime Roofing ("Showtime"). Father's wife is the legal owner of Showtime because she was able to obtain the financing for the business.

[13] In July 2023, Father filed a motion for rule to show cause, wherein he alleged that his fourteen-year-old daughter, A.B., had refused to attend parenting time with him and that Mother had "engaged in actions to manipulate [A.B.] and prevent the prescheduled parenting time." (App. Vol. 2 at 97). According to

Father, "Mother ha[d] historically engaged in inappropriate actions and communications with [A.B.] intended to manipulate [A.B.]." (App. Vol. 2 at 99). Father asked the trial court to order Mother to show cause why she should not be held in contempt for failing to comply with the Agreed March 2020 Order and to award Father the attorney fees that he had incurred in bringing his motion.

[14] In October 2023, Father filed a petition to modify custody of the children. In this motion, Father alleged that there had been a substantial and continuing change of circumstances that rendered the Agreed March 2020 Order unreasonable and that the best interests of the children would be served by modifying that order.

[15] The trial court held a hearing on all pending motions in December 2023. At the hearing, Father tendered to the trial court a Child Support Worksheet that listed Mother's weekly income as $760 and his weekly income as $1,000. According to Father's child support worksheet, he would owe $91 per week in child support. In addition, Father testified that he and his wife had earned $52,000 in one year from Showtime.[2] Father agreed that the roofing business is "a cash heavy, a financing heavy business[]" because he has to pay for materials, whose costs are increasing exponentially, and labor before his clients pay him several

___

[2] The trial court admitted into evidence Father's 2022 and 2021 1040 tax returns. Father's 2022 tax return, which he filed as married filing separately, shows an income of $76,422. Father's 2021 tax return, which he filed jointly with his wife, shows income of $149,821.

months later. (Tr. Vol. 2 at 86). Father also testified that Showtime owns six trucks that the employees drive. In addition, Father testified that he and his wife own a Dodge Charger Hellcat and a Dodge Durango Hellcat. Father asked the trial court to calculate his child support based upon his actual income.

[16] During Mother's cross-examination of Father regarding Father's role in the business, the trial court stated that it was "very confused" about the reason that Father had been "let go" from American Dream. (Tr. Vol. 2 at 112). The trial court further noted that "at least one of you is making the argument that perhaps the income is not what is stated on the Financial Declaration Forms[.]" (Tr. Vol. 2 at 112).

[17] Father further testified that it was his understanding that, pursuant to the Agreed March 2020 Order, Parents had to agree on the children's extracurricular activities before he had to pay his percentage of the expenses for those activities. According to Father, he had asked Mother to discuss activities with him before she registered the children for them. However, Mother had ignored his request. Father also testified that he had previously objected to certain extracurricular activities but that Mother had not responded to his objections. According to Father, he had paid his percentage of the cost for any extracurricular activities to which he had agreed.

[18] Also, at the hearing, Mother tendered to the trial court a child support worksheet that listed her weekly income as $760 and Father's weekly income as $3,330.93. According to Mother's child support worksheet, Father would owe

$526 per week in child support. Mother acknowledged that the $3,330.93 weekly income that she had attributed to Father was based on the salary that he had been making at the time of the Agreed March 2020 Order. Mother did not provide any further testimony regarding Father's weekly income. In addition, she did not offer any evidence to the trial court that Father's testimony was not an accurate depiction of his financial situation, his job search, or job opportunities in the Greenfield area.

[19] Mother also tendered to the trial court a summary of expenses that she had paid for the children's extracurricular activities.[3] According to Mother, the Agreed March 2020 Order did not require Parents to agree to the extracurricular activities. Rather, Mother believed that the Agreed March 2020 Order simply required Father to pay 75% of the expenses for extracurricular activities. Mother further testified that, pursuant to the terms of the Agreed March 2020 Order, Father owed her $3,456 for these expenses. Mother asked the trial court to order Father to pay her $3,456 for those expenses, to hold Father in contempt for failing to previously pay her those expenses, and to order Father to reimburse her for the attorney fees that she had incurred in filing the contempt motion.

[20] During cross-examination, Father's counsel asked Mother if she could give him an example of a decision concerning the children that she had consulted with

---

[3] The trial court admitted Mother's summary of expenses as Mother's Exhibit 5. However, this exhibit is not included in either of the two exhibit volumes.

Father on within the previous two years. Mother responded, "I'm not sure." (Tr. Vol. 2 at 51).

[21] In March 2024, the trial court issued an order ("the March 2024 Order") that provides, in relevant part, as follows:

> 40.  Father requested the Court use a lower income for him in calculating child support.
>
> 41.  Father testified his wife provided investment for his business.
>
> 42.  Father testified about his prior ownership interests in businesses, as well as assets of his current business and personal assets.
>
> 43.  Father purchased a home for over $400,000 in the last few years. Father's business has 6 large vehicles, and while the business is "woman-owned" on paper, Father testified that his wife does whatever *he* tells her to, suggesting he is actually running the business.
>
> 44.  Father's lifestyle suggests that any reduction in his income is by choice.
>
> 45.  The Court finds that Father earns or is capable of earning $3,330.93/week.
>
> 46.  Father should have credit for 98 overnights.
>
> 47.  The Court prepared worksheets using both the pre-2024 child support guidelines and the child support guidelines currently in effect, attached hereto.
>
> 48.  Under both calculations, the presumed obligation is less than 20% different from the obligation under the [March] 2020 Order.

49.    Therefore, the Court DENIES [Father's] request[] to modify child support.

50.    The parties' [March] 2020 Order calls for them to divide extracurricular activities with Father paying 75% and Mother paying 25%, and the order does not call for the activities to be "agreed."

51.    Father owes to Mother the sum of $3,647.75 for outstanding extracurricular activities.

\*    \*    \*    \*    \*

53.    Father is in contempt for his failure to pay extracurricular costs as ordered.

\*    \*    \*    \*    \*

55.    For his contempt, Father shall reimburse Mother the sum of $1,000 in attorney fees.

(App. Vol. 2 at 71-72).

[22]    In April 2024, Father filed a motion to correct error. The trial court held a hearing on Father's motion on June 11, 2024. Because the trial court failed to rule on the motion within thirty days, the motion was deemed denied. On July 17, 2024, the trial court issued an order ("the July 2024 Order"), which acknowledged that Father's motion to correct error had been "deemed denied by dates[.]" (App. Vol. 2 at 77). However, the trial court "provid[ed] the

parties with findings [that] m[ight] assist them in their understanding" of the March 2024 order.[4] (App. Vol. 2 at 77).

[23] Father now appeals.

## Decision

[24] At the outset, we note that neither party requested special findings under Indiana Trial Rule 52(A) and that the trial court entered its findings sua sponte. As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *McDaniel v. McDaniel*, 150 N.E.3d 282, 289 (Ind. Ct. App. 2020), *trans. denied*. We review any remaining issues under the general judgment standard and will affirm the judgment if it can be sustained on any legal theory consistent with the evidence. *Id.* "'[W]e may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court.'" *Id.* (quoting *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013), *aff'd on reh'g*).

---

[4] Indiana Trial Rule 53.3(A) provides that "[i]n the event a court fails . . . to rule on a Motion to Correct Error within thirty (30) days after it was heard[,] . . . the pending Motion to Correct Error shall be deemed denied." Further, this Court has previously explained that "[t]he failure to act on a motion to correct error within the rule's prescribed time limits extinguishes the court's authority to rule on the motion and any subsequent ruling is a nullity." *Johnson v. Johnson*, 882 N.E.3d 223, 226-27 (Ind. Ct. App. 2008) (cleaned up), *superceded by statute on other grounds as stated in Campbell v. George*, 77 N.E.3d 816, 817 (Ind. Ct. App. 2017). Accordingly, in our analysis of the issues, we will not consider the findings in the July 2024 order.

[25] We further note that Mother did not file an appellee's brief. When an appellee does not submit a brief, we do not undertake the burden of developing arguments for that party. *Easterday v. Everhart*, 201 N.E.3d 264, 268 (Ind. Ct. App. 2023). Instead, we apply a less strict standard of review and may reverse if the appellant establishes prima facie error. *Id*. Prima facie error is "error at first sight, on first appearance, or on the face of it." *Id*. (cleaned up). "Still, we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required." *Jenkins v. Jenkins*, 17 N.E.3d 350, 352 (Ind. Ct. App. 2014). We now turn to the issues in this case.

[26] Father argues that the trial court: (1) clearly erred when it denied his motion to modify child support; and (2) abused its discretion when it found him to be in contempt for failing to pay Mother for the children's past extracurricular activities. We address each of his contentions in turn.

## 1. Child Support

[27] Father first argues that the trial court clearly erred when it denied his motion to modify child support. A trial court's calculation of child support is presumptively valid, and we will reverse a support order only for clear error. *Bogner v. Bogner*, 29 N.E.3d 733, 738 (Ind. 2015). That is, reversal is proper only where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id*.

> We recognize of course that trial courts must exercise judgment, particularly as to credibility of witnesses, and we defer to that judgment because the trial court views the evidence firsthand and

we review a cold documentary record. Thus, to the extent credibility or inferences are to be drawn, we give the trial court's conclusions substantial weight. But to the extent a ruling is based on an error of law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result.

*MacLafferty v. MacLafferty*, 829 N.E.2d 938, 941 (Ind. 2005).

[28] Modification of child support is guided by INDIANA CODE § 31-16-8-1(b)(1), which provides that, except as provided in INDIANA CODE § 31-16-8-2, "modification may be made only: (1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable[.]" The party seeking the modification bears the burden of establishing that the statutory requirements have been met. *Hedrick v. Gilbert*, 17 N.E.3d 321, 327 (Ind. Ct. App. 2014).

[29] Here, Father testified that he had lost his job with American Dream through no fault of his own, and he requested a modification of child support to reflect his reduced income. The trial court found that Father was not entitled to a modification because he was essentially voluntarily underemployed without just cause and that his child support obligation should be based upon his potential income. The trial court imputed to Father a weekly income of $3,330.93 based upon Father's past earnings and declined to modify his support obligation. We will reverse a trial court's decision regarding a parent's unemployment or underemployment and imputation only for an abuse of discretion. *In re Paternity of Pickett*, 44 N.E.3d 756, 767 (Ind. Ct. App. 2015).

[30]     Regarding the trial court's finding that Father was voluntarily underemployed without just cause, we note that it is apparent from the record and the order denying Father's request for a modification of child support that the trial court did not find credible Father's testimony regarding the reasons for his termination and rejected any claim that Father was not voluntarily unemployed without just cause. The trial court was not required to accept Father's testimony as true. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) (explaining that "factfinders are not required to believe a witness's testimony even when it is uncontradicted"). And, given our deferential review of a trial court's credibility determination, we conclude that the trial court did not abuse its discretion in finding that Father was voluntarily underemployed without just cause.

[31]     Regarding the trial court's imputation to Father a potential income of $3,330.93 per week, we note that the Child Support Guidelines permit imputation of income to discourage parents from avoiding significant child support obligations by becoming unemployed or taking a lower paying job. *Sandlin v. Sandlin*, 972 N.E.2d 371, 375 (Ind. Ct. App. 2012). However, "the Guidelines do not require or encourage parents to make career decisions based strictly upon the size of potential paychecks, nor do the Guidelines require that parents work to their full economic potential." *Id*. Further, the Guidelines caution that "attributing potential income that results in an unrealistic child support obligation may cause the accumulation of an excessive arrearage, and be

contrary to the best interests of the child(ren)." Child Supp. G. 3(A)(3), cmt 2(c).

[32] Child Support Guideline 3(A)(3) provides that "[i]f a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income." "A determination of potential income *shall be made* by determining employment potential and probable earnings level based on the obligor's employment and earnings history, occupational qualifications, educational attainment, literacy, age, health, criminal record or other employment barriers, prevailing job opportunities, and earnings levels in the community." Child Supp. G. 3(A)(3) (emphasis added).

[33] Here, our review of the record reveals that although Mother had the burden to present evidence on her claim that income should be imputed to Father, *see Walters v. Walters*, 186 N.E.3d 1186, 1193 (Ind. Ct. App. 2022) (explaining that the parent arguing for the imputation of income to another parent bears the burden of persuasion), Mother did not do so. She simply asserted Father's income should be set at what he had previously earned. On the other hand, Father simply asserted that he could not find comparable employment and now earned substantially less than $180,000 per year.

[34] Because no evidence addressing any of the factors for determining potential income was presented by either party, we conclude that the trial court abused its discretion when it imputed to Father a potential income of $3,330.93 per

week and clearly erred when it denied his motion to modify child support. Accordingly, we reverse and remand with instructions for the trial court to hold a hearing for additional evidence to be presented on the relevant factors that the trial court should consider when determining Father's potential income and to adjust its order as necessary to impute an appropriate level of potential income to Father based on that evidence. *See Walters*, 186 N.E.3d at 1193 (remanding for the trial court to hear additional evidence on the enumerated potential income factors where evidence was sufficient to support the underemployment finding but not to support the amount of potential income imputed).

## 2. Contempt

[35] Father further argues that the trial court abused its discretion when it found Father to be in contempt for failing to pay Mother $3,647.75 for their children's past participation in extracurricular activities. The gravamen of his argument is that the trial court misinterpreted the Agreed March 2020 Order when it determined that Father did not have to agree to the extracurricular activities before being responsible to pay for them.

[36] It is within the trial court's discretion to determine whether a party is in contempt, and we review the judgment under an abuse of discretion standard. *G.G.B.W. v. S.W.*, 80 N.E.3d 264, 268-69 (Ind. Ct. App. 2017), *trans. denied*. "We will reverse a trial court's contempt findings only if there is no evidence or inferences drawn therefrom to support them." *Id*. at 269.

[37] To be held in contempt, a party must have willfully disobeyed a court order. *Id.* The order must have been so clear and certain that there could be no question as to what the party must do, or not do, so there could be no question whether the order had been violated. *Id.*

[38] Here, Father argues that "[p]ursuant to the plain language of the [Agreed] March 13, 2020 Order, [he] cannot be required to pay the cost of extracurricular activities to which he did not agree and of which he was not informed." (Father's Br. 13). In support of his argument, he directs us to the following provision of the Agreed March 2020 Order: "All decisions which do not fall into the above category of "routine decision" will be made ***only with the prior consent and approval of both parents*** . . . . Included among the types of decisions which are not "routine decisions" . . . are . . . ***selection of extra-curricular activities*** . . ." (Father's Br. 13) (emphases in the original).

[39] At the outset, it is important to note that this is a case of the trial court interpreting an agreement of the parties rather than an order of its own creation. *See G.G.B.W.*, 80 N.E.3d at 269. "In the usual case, freedom of contract will, it is hoped, produce mutually acceptable accords, to which parties will voluntarily adhere." *Id.* (cleaned up). There may be nuances to and purposes underlying the parties' agreement to which the trial court may not be privy. *Id.*

[40] "Settlement agreements are contractual in nature and, once incorporated into a trial court's final order, become binding on the parties." *Id.* The interpretation and construction of contract provisions is a function for the courts. *Overholtzer*

*v. Overholtzer*, 884 N.E.2d 358, 361 (Ind. Ct. App. 2008), *reh'g denied*. In other words, reviewing the terms of a contract is a pure question of law. *G.G.B.W*, 80 N.E.3d at 270. Therefore, our standard of review is de novo. *Id*.

[41] To interpret a contract, a court first considers the parties' intent as expressed in the language of the agreement. *Id*. The court must then read all the provisions as a whole to find an interpretation that harmonizes the contract's words and phrases and gives effect to the parties' intentions at the time they entered the agreement. *Id*. If the terms of the contract are unambiguous, the terms will be given their plain and ordinary meaning. *Oberholtzer*, 884 N.E.2d at 361. The terms of a contract are not ambiguous simply because controversy exists between the parties regarding the proper interpretation of terms. *Id*. Where the terms of the contract are clear and unambiguous, the terms are conclusive, and we will not construe the contract or look at extrinsic evidence. *Id*. Rather, we will merely apply the contractual provisions. *Id*.

[42] Here, our review of the Agreed March 2020 Order reveals that Father is correct in his interpretation. Specifically, the Agreed March 2020 Order provides that non-routine decisions are to be made only with the prior consent and approval of *both* parents. This order further provides that decisions relating to the children's extracurricular activities are non-routine. Thus, pursuant to the Agreed March 2020 Order, Father must consent and approve of the children's extracurricular activities before he is required to pay for them.

[43]     Accordingly, the trial court misinterpreted the agreement when it found that the Agreed March 2020 Order did not call for the activities to be agreed. The trial court's misinterpretation of this order led the trial court to abuse its discretion when it found that Father was in contempt for his failure to pay extracurricular costs and ordered him to pay Mother $3,647.75 for their children's past participation in extracurricular activities. Therefore, we reverse that portion of the trial court's order that found Father to be in contempt for failing to pay Mother for the children's past extracurricular activities and remand with instructions for the trial court to vacate that portion of its order that found Father in contempt for failing to pay these past activities. We also instruct the trial court to vacate that portion of its order that required Father to pay Mother $3,647.75 for the past activities and ordered Father to reimburse Mother $1,000 for the attorney fees that she incurred in bringing her contempt petition.

[44]     Reversed and remanded with instructions.


Bradford, J., concurs.
Kenworthy, J., concurs in result.


ATTORNEY FOR APPELLANT

Brian R. DeHem
DeHem Law, LLC
Noblesville, Indiana